479 S.E.2d 35

Gayle H. TAYLOR and Thomas C. Taylor,
Respondents–Appellants,

v.

Rajko D. MEDENICA, M.D., and Cancer Immuno–Biology Laboratory, Inc., Defendants, of whom Rajko D. Medenica, M.D., is Appellant–Respondent, and Cancer Immuno–Biology Laboratory, Inc., is Respondent–Appellant.

No. 24528.

Supreme Court of South Carolina.

Heard Sept. 18, 1996.
Decided Nov. 12, 1996.
Rehearing Denied Dec. 5, 1996.

202

Stephen P. Groves and John Hamilton Smith, of Young, Clement, Rivers & Tisdale, LLP, Charleston; David A. Brown, of Aiken; and Hutson S. Davis, Jr., of Davis, Tupper, Grimsley & Seelhoff, Beaufort, for appellant-respondent.

Terry A. Finger, of Finger & Taylor, P.A., Hilton Head Island; Andrew M. Scherffius, Atlanta, GA; and John E. Parker, of Peters, Murdaugh, Parker, Eltzroth & Detrick, Hampton, for respondents-appellants.

M. Dawes Cooke and Matthew H. Henrickson, Barnwell, Whaley, Patterson & Helms, LLC, Charleston, for respondent-appellant.

BURNETT, Justice:

Respondent–Appellant Gayle H. Taylor (Mrs. Taylor) brought this medical malpractice action against appellant-respondent Rajko D. Medenica (Dr. Medenica) and respondent-appellant Cancer Immuno–Biology Laboratory, Inc. (CIBL)[1] alleging negligence and violation of the South Carolina Unfair Trade Practices Act (the UTPA).[2] Thomas C.

---

1. At times, Dr. Medenica and CIBL will be referred to collectively as "the defendants."

2. South Carolina Code Ann. §§ 39–5–10 to –160 (1985).

Taylor (Mr. Taylor) brought a loss of consortium action against the defendants. Specifically, the Taylors alleged Dr. Medenica recklessly violated the acceptable standard of medical care by including Mitomycin–C (MMC) in Mrs. Taylor's chemotherapy regime, by failing to warn Mrs. Taylor of the potentially fatal side effects of this drug, by failing to obtain Mrs. Taylor's informed consent, by failing to diagnosis Mrs. Taylor's condition, and in causing Mrs. Taylor to undergo unwarranted laboratory tests and studies. Mrs. Taylor alleged CIBL, of which Dr. Medenica is the sole stockholder and medical director, performed and billed her for numerous laboratory tests and studies which it either knew or should have known were unwarranted. She alleged that through this conduct, the defendants violated the UTPA. The defendants denied the material allegations of the complaints.

The jury returned a verdict of $1,000,000 actual damages and $10,000,000 punitive damages on Mrs. Taylor's negligence claim against Dr. Medenica and a verdict of $2,000,000 for Mr. Taylor on his loss of consortium action against Dr. Medenica. The jury returned a $1,000,000 verdict against both defendants on Mrs. Taylor's UTPA cause of action.

After the jury verdict, the trial court granted Mrs. Taylor's motion to reduce the UTPA award from $1,000,000.00 to $543,614.19, which she claimed represented the actual medical bills and family expenses related to her treatment. Finding the defendants had wilfully violated the UTPA, the trial court granted Mrs. Taylor's request to treble the actual damages.[3]

Over Mrs. Taylor's objection, the trial court granted the defendants' motion to require her to elect between recovery under negligence or the UTPA. Mrs. Taylor elected to recover under negligence.

## FACTS [4]

In June 1991, Mrs. Taylor was diagnosed with breast cancer and a mastectomy was performed at Hilton Head Island

---

**3.** The trial court found Mrs. Taylor to be entitled to an attorney's fee but declined to set a fee. *See* S.C.Code Ann. § 39–5–140(a).

**4.** While the facts are basically undisputed, it is necessary to recite them here in order to properly evaluate the punitive damage award.

Hospital. At this time Mrs. Taylor was 34 years old and had three young children. After the surgery, hospital doctors suggested Mrs. Taylor contact the hospital oncologist, Dr. Medenica, to determine whether any further treatment was necessary. At their first meeting, Dr. Medenica told the Taylors the removed lymph nodes were negative, indicating the cancer had not spread and while Mrs. Taylor might need some type of further treatment, she would not require chemotherapy.

On July 26, 1991, the Taylors again met with Dr. Medenica. At this appointment, Dr. Medenica stated he had received laboratory reports indicating the tumor was very aggressive and Mrs. Taylor would need six to eight months of chemotherapy. Dr. Medenica informed the Taylors he would treat Mrs. Taylor with a combination of drugs, including MMC. Dr. Medenica assured the Taylors this was standard chemotherapy and Mrs. Taylor would receive the same treatment anywhere. He explained the side effects of this chemotherapy were nausea, vomiting, and hair loss. Dr. Medenica did not mention the chance of contracting a potentially fatal blood disease from the use of MMC.

Dr. Medenica's nurse provided the Taylors with written information on the drugs which would be administered. Regarding MMC, the information stated, in relevant part, as follows:

[c]ommon side effects: decreased white blood cells, bone marrow cells, and platelets three to eight weeks after start of therapy. The drug is relatively well-tolerated! Less common side effects: nausea and vomiting, anorexia ..., hair loss, fatigue, kidney toxicity ... fever. There are medicines that can be given that will minimize some of the above side effects. Most of the above side effects last for a short period of time ...

Mrs. Taylor did not sign an informed consent document.

Mrs. Taylor began chemotherapy at Hilton Head Island Hospital in August 1991. She became ill and her condition became worse through the Fall. Dr. Medenica assured Mrs. Taylor her symptoms were the side affects of the chemotherapy. In January 1992, Dr. Medenica informed the Taylors the cancer was gone and he discharged Mrs. Taylor.

Mrs. Taylor's condition continued to deteriorate. In early February 1992, Dr. Medenica's nurse informed Mrs. Taylor she did not "like the looks" of Mrs. Taylor's last blood test. Mrs. Taylor received two units of blood at the hospital. After the transfusion, Mrs. Taylor felt worse. Two days later, Mrs. Taylor saw Dr. Medenica. He stated she was fine and to continue on the blood pressure medication Dr. Hart, Mrs. Taylor's general practitioner, had prescribed.

On February 10, Dr. Hart admitted Mrs. Taylor into the hospital for two days. Dr. Medenica visited Mrs. Taylor and told her she was feeling the after affects of the chemotherapy and would get better.

Dr. Hart had Mrs. Taylor report to his office every other day. She was swollen, had a continual fever, and high blood pressure. The doctor noted her kidneys were not functioning properly. After conducting more blood tests, Dr. Hart again hospitalized Mrs. Taylor on February 20, 1992.

Dr. Medenica examined Mrs. Taylor in the hospital. He thought she had had a reaction to an antibiotic prescribed by Dr. Hart. Dr. Medenica did not indicate Mrs. Taylor was having a reaction to MMC.

Mrs. Taylor continued to feel worse in the hospital. She was horribly swollen, covered with bruises, had diarrhea, was nauseated, and was weak. A bone marrow aspirant was performed to determine whether the cancer had returned. The results were negative. Dr. Hart contacted Dr. Jon Gockerman, an oncologist at Duke University Medical Center. Dr. Gockerman determined Mrs. Taylor had contracted hemolytic uremic syndrome (HUS).[5] Mrs. Taylor was flown on an emergency basis to Duke.

At Duke, Dr. Gockerman told Mrs. Taylor the HUS was caused by the MMC treatment. Dr. Gockerman told the Taylors not many people survive this disease.

Over the next five months, Mrs. Taylor was a patient at Duke. A permacatheter was surgically placed into her chest and she received 210 plasmapheresis treatments. Mrs. Taylor's kidneys failed and she was placed on dialysis. She had congestive heart failure and was placed in intensive care for

---

5. HUS is a disease in which the blood destroys itself.

several days. Mrs. Taylor had hemorrhages in her eyes, two detached retinas, and lost her sight for six weeks. Mrs. Taylor had bouts of abdominal pain and hypertension. On advice from psychiatrists, Mrs. Taylor's children were brought to Duke and she told them she was going to die.

Mrs. Taylor's kidneys are permanently damaged. Her vision is impaired. Her stamina is limited and she can no longer participate in activities she previously enjoyed.

Three weeks prior to trial, Dr. Gockerman testified Mrs. Taylor was informed her breast cancer had returned in her lungs and liver. Standard methods of treatment will not cure her. Because of the damage to her kidneys, Dr. Gockerman testified Mrs. Taylor is ineligible for very high dose chemotherapy or a bone marrow transplant. Dr. Gockerman testified Mrs. Taylor will die from the cancer.

Dr. Gockerman agreed Mrs. Taylor's breast cancer should have been treated with adjuvant chemotherapy, but testified there are defined adjuvant treatment plans which should have been used.[6] Dr. Gockerman stated he knows of no literature which recommends the use of MMC in an adjuvant chemotherapy setting and it is only used in late breast cancer when standard therapy has failed. Dr. Gockerman concluded Dr. Medenica violated the standard of care by treating Mrs. Taylor with MMC.

Dr. Gockerman further testified Dr. Medenica violated the standard of care by failing to observe the common signs and symptoms of developing HUS in Mrs. Taylor. According to Dr. Gockerman, because Dr. Medenica was treating her with MMC, he should have diagnosed Mrs. Taylor as suffering from HUS during her first hospital admission in early February 1992.

The Taylors' four other expert witnesses offered similar testimony. Dr. Worta McCaskill–Stevens, Dr. Robert Smith, Dr. Howard Ozer, and Dr. Herbert. Rappoport testified the MMC therapy caused Mrs. Taylor's HUS, there are no scientific studies or literature which support the use of MMC in the

---

6. Adjuvant chemotherapy is administered after local regional therapy, such as removal of the breast, to eradicate the cancer cells that may have been left behind. It is considered preventative chemotherapy.

adjuvant treatment of breast cancer, and use of MMC violated the generally accepted standard of medical care. They testified Dr. Medenica's failure to obtain Mrs. Taylor's informed consent was a further violation of the standard of care.

One expert, Dr. Ozer, testified he had had a conversation with Dr. Medenica in September 1992. During this conversation, Dr. Medenica stated MMC was too aggressive and he would probably not use it to treat other patients with similar breast cancer in the future.

Dr. Medenica agreed the accepted standard treatment for primary breast cancer is adjuvant chemotherapy consisting of drugs other than MMC. He admitted his own paper on primary breast cancer, written and presented in October 1991, did not mention the use of MMC. Dr. Medenica stated he had treated 2,000 patients with MMC, but none of the patients were lymph node negative like Mrs. Taylor. Dr. Medenica testified he knew MMC could cause HUS.

Dr. Gockerman testified 99% of the laboratory studies performed by CIBL, some as many as fifteen times, were not indicated by Mrs. Taylor's breast cancer and the studies were "absolutely" a deviation from the generally accepted standard of medical care. Dr. Gockerman testified the pharmacosensitivity studies in which the cancer cells are treated with various drugs in a laboratory to determine which drugs destroy the cancer and which were performed by CIBL do not work. Other experts testified CIBL's laboratory tests were excessive, "absolutely bizarre," and the results were questionable. One expert testified he believed the laboratory tests were conducted for the purpose of generating income. One witness testified there was no medical reason for *any* of the CIBL tests. Another witness stated some of the tests were medically worthless and painful.

A former employee of CIBL testified pharmacosensitivity tests which cost approximately $70 were performed on every tumor received by CIBL. CIBL charged $2,627 for this test. Similarly, CIBL billed patients $485 for tissue storage which cost the laboratory $30. This witness testified Mrs. Taylor was charged $455 for an interferon quality control test and $875 for an interferon inhibitor factor test even though she

was not receiving interferon. The witness stated she had concerns about the frequency and costs of CIBL's tests.

## ISSUES

I. Did the trial court err in allowing Dr. Medenica to be cross-examined on a document compiled by the American Cancer Society?

II. Did the trial judge err by allowing Dr. Ozer to testify?

III. Did the trial judge err by allowing Jacques Torrent to offer hearsay testimony?

IV. Did the trial judge err by allowing Dr. Smith and Mr. Taylor to testify as to Mrs. Taylor's ineligibility for aggressive treatment for her recurrent breast cancer?

V. Did the trial judge err in limiting Governor West's testimony?

VI. Did the trial judge err in admitting evidence of Dr. Medenica's prior convictions since there was no evidence these convictions were obtained by due process?

VII. Did the trial judge err by permitting Mrs. Taylor to file a second amended complaint?

VIII. Did the trial judge err by holding CIBL was subject to the UTPA?

IX. Did the trial judge err by granting the defendants' motion to require Mrs. Taylor to elect between her cause of action for negligence and violation of the UTPA?

X. Does Mrs. Taylor have any ascertainable damages under the UTPA?

XI. Did the trial judge err by refusing to define "clear and convincing?"

XII. Did the trial judge err by denying Dr. Medenica's motions for a directed verdict and judgment notwithstanding the verdict on punitive damages?

XIII. Did the trial judge err by dismissing the Taylor children's cause of action for loss of parental consortium?

*DISCUSSION*

I.

■ During cross-examination, the Taylors questioned Dr. Medenica, over his objection, about a document compiled by the American Cancer Society. CIBL now argues the trial judge erred in allowing the Taylors to cross-examine Dr. Medenica on this document. We disagree.

Because CIBL did not interpose an objection at trial regarding this issue, CIBL cannot raise the issue on appeal. *Brock v. Board of Adjustment and Appeals of the City of Rock Hill,* 308 S.C. 539, 419 S.E.2d 773 (1992) (where appellant's counsel made no objection at trial, he cannot raise the issue on appeal even though appellant's co-defendant objected).

II.

■ Dr. Medenica and CIBL argue the trial judge erred by permitting Dr. Ozer to testify as an expert witness. They contend Dr. Ozer obtained his knowledge of Dr. Medenica's treatment of Mrs. Taylor solely from the peer review process and, consequently, the information was confidential and inadmissible at trial pursuant to S.C.Code Ann. § 40–71–20 (Supp. 1995). We disagree.

S.C.Code Ann. § 40–71–20 (Supp.1995) provides, in part, as follows:

All proceedings of and all data and information acquired by the committee referred to in Section 40–71–10 [7] in the exercise of its duties are confidential.... These proceedings and documents are not subject to discovery, subpoena, or introduction into evidence in any civil trial.... *Information, documents, or records which are otherwise available from original sources are not immune from discovery or*

---

7. S.C.Code Ann. § 40–71–10 (Supp.1995) refers to the following committees: 1) a committee which is formed to maintain professional standards of a state or local professional society (consisting of the majority of the eligible professionals); 2) a committee of a medical staff of a licensed hospital, provided the medical staff operates pursuant to written bylaws which have been approved by the governing body of the hospital; and 3) a committee appointed by the Department of Health and Environmental Control to review patient medical and health records in order to study the causes of death and disease.

> *use in a civil action merely because they were presented during the committee proceedings nor shall any ... witness* before the committee *be prevented from testifying in a civil action as to matters of which he has knowledge apart from the committee proceedings ...*

(Emphasis added).

The record provides no testimony on the establishment of a peer review committee at Hilton Head Island Hospital. However, assuming there was a peer review committee within the meaning of S.C.Code Ann. § 40–71–10 of which Dr. Ozer was a member, the evidence of record indicates Dr. Ozer's testimony was based on information he obtained independently of the peer review committee process. In preparing for Mrs. Taylor's trial, Dr. Ozer testified he had reviewed two letters which he had previously written regarding Dr. Medenica and Mrs. Taylor's medical records which had been provided by Mrs. Taylor's counsel. He further stated his conversation with Dr. Medenica in September 1992 was not part of the peer review process.

Since Dr. Ozer's own writings and Mrs. Taylor's medical records were not obtained from the peer review committee and Dr. Ozer's conversation with Dr. Medenica was not part of the peer review committee process, Dr. Ozer was properly allowed to testify about these documents and conversation. *McGee v. Bruce Hospital System,* 312 S.C. 58, 439 S.E.2d 257 (1993) (plaintiff seeking discovery cannot obtain documents which are available from the original source directly from hospital committee, but may seek it from alternative sources).[8]

## III.

Dr. Medenica and CIBL argue the trial judge erred by allowing Jacques Torrent to testify about the Parliament of

---

8. Dr. Medenica further argues The Health Care Quality Improvement Act of 1986 (the HCQIA), 42 U.S.C. § 11101, *et seq.* (1995), provides for confidentiality of information reported to the Secretary of Health and Human Services under the physician peer review process. Dr. Medenica did not raise the applicability of this federal law at trial. Therefore, his argument is not preserved for appeal. *McGee v. Bruce Hospital System,* 321 S.C. 340, 468 S.E.2d 633 (1996).

the Canton of Geneva's investigation of The Canton Hospital and Dr. Medenica because the testimony was hearsay.[9]

 Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the matter asserted. *State v. Johnson,* 476 S.E.2d 681 Op. No. 24457 (S.C.Sup.Ct.1996) (Davis Adv.Sh. No. 17); *Player v. Thompson,* 259 S.C. 600, 193 S.E.2d 531 (1972). Improperly admitted hearsay which is merely cumulative to other properly admitted evidence may be harmless error. *State v. Barrett,* 299 S.C. 485, 386 S.E.2d 242 (1989).

Mr. Torrent testified he was a member of the Parliament of the Canton of Geneva, Switzerland, from 1975 to 1993. He explained he was one of fifteen members appointed to investigate the management of The Canton Hospital from 1982 to 1984. Mr. Torrent stated, as part of this investigation, the committee made findings of fact relating to the conduct of Dr. Medenica who was then the coordinator of the Yugoslavian program at the hospital. Mr. Torrent testified the committee concluded Dr. Medenica engaged in unauthorized private medical practice and participated in irregular billing procedures which cost the Yugoslavian government $5,000,000.

Mr. Torrent's testimony was inadmissible hearsay. Nonetheless, the testimony was cumulative to evidence regarding Dr. Medenica's criminal convictions in Switzerland for falsifying documents and fraud and his criminal conviction in Yugoslavia for irregularities which occurred at a hospital in Switzerland. Accordingly, the error was harmless. *Id.*

---

**9.** While Dr. Medenica states this as his issue, he argues, however, Mr. Torrent's testimony was inadmissible as evidence of prior bad acts. CIBL objected to Mr. Torrent's testimony on this basis; Dr. Medenica did not. Therefore, Dr. Medenica's argument regarding prior bad acts is not preserved for appellate consideration. *Brock v. Board of Adjustment, supra.*

Moreover, during oral argument, Dr. Medenica argued Mr. Torrent's testimony describing as immoral Dr. Medenica's practice of billing poor Yugoslavian patients while not billing influential Yugoslavian patients was improper. Dr. Medenica expressed no objection to this testimony at trial. Accordingly, this argument is not preserved for the Court's review. *Medlock v. One 1985 Jeep Cherokee VIN 1JCWB7828FT129001,* 322 S.C. 127, 470 S.E.2d 373 (1996) (a contemporaneous objection is required to preserve an issue for appellate review).

## IV.

 Dr. Medenica argues the trial judge erred by allowing Dr. Robert Smith and Mr. Taylor to testify that, as a result of her treatment by Dr. Medenica, Mrs. Taylor is unable to receive high dose chemotherapy or a bone marrow transplant. He contends this evidence was inadmissible because South Carolina has rejected the "loss of chance" doctrine.[10]

Prior to objecting to Dr. Smith's and Mr. Taylor's testimony as to Mrs. Taylor's ineligibility for high dose chemotherapy and a bone marrow transplant, Mrs. Taylor had already offered evidence of this nature through her own testimony and that of Dr. Gockerman. Accordingly, because the testimony about which Dr. Medenica complains was cumulative to other similar testimony, there was no error in its admission. *McGee v. Bruce Hospital System*, 321 S.C. 340, 468 S.E.2d 633 (1996) (even if admission of evidence was error, it is harmless if it was merely cumulative to other evidence).

## V.

 Dr. Medenica and CIBL argue the trial judge erred by limiting the testimony of former Governor John West. They contend Governor West was offered to rebut the Taylors' testimony concerning Dr. Medenica's "bad character" and his self-inflated medical credentials and background, and the trial judge's limitation of this testimony prejudiced their defense. We disagree.

The record indicates Dr. Medenica and CIBL were not prohibited from placing into evidence the substance of Governor West's testimony. Before the jury, Governor West testified he became acquainted with Dr. Medenica in 1980. He explained his daughter-in-law was ill and he personally investi-

---

**10.** The "loss of chance" doctrine permits recovery when the delay in proper diagnosis or treatment of a medical condition results in the patient being deprived of a less than even chance of surviving or recovering. This Court has rejected the "loss of chance" doctrine because it does not comport with the South Carolina standard that, in a medical malpractice action, the plaintiff who relies on expert testimony must introduce evidence that the defendant's negligence most probably resulted in the injuries alleged. *Jones v. Owings*, 318 S.C. 72, 456 S.E.2d 371 (1995).

gated Dr. Medenica's background, experience, and qualifications before allowing the doctor to treat her. The Governor stated he specifically discussed Dr. Medenica with the then President of the American Cancer Society.

Governor West further testified he was involved, on the doctor's behalf, in the criminal proceedings against Dr. Medenica in Switzerland. He stated Dr. Medenica was convicted *in absentia* of some criminal charges but found not guilty on all counts accusing him of personal gain. The Governor stated the Swiss government lost no money as a result of Dr. Medenica. Governor West also testified there had been two commissions which actually investigated The Hospital of the Canton of Geneva and one of the commissions found no misconduct on the part of Dr. Medenica. Finally, Governor West testified Dr. Medenica has an outstanding reputation and that he is a great admirer of the doctor.

The testimony presented to the jury fairly comprises Governor West's proffered evidence. Accordingly, the trial judge did not err by limiting Governor West's testimony. *Id.* (even if admission of evidence was error, it is harmless if it was merely cumulative to other evidence).

## VI.

Dr. Medenica and CIBL argue the trial judge erred by permitting the Taylors to cross-examine Dr. Medenica about his convictions in Switzerland and Yugoslavia since those convictions were obtained without due process of law. We disagree.

At trial, Dr. Medenica argued solely that this testimony was collateral and not relevant. Accordingly, this issue is not preserved for appeal. *Id.* (issue not raised in the trial court will not be considered on appeal); *State v. Hudgins*, 319 S.C. 233, 460 S.E.2d 388 (1995) (an issue is not preserved if party argues one ground for objection at trial and another ground on appeal).

## VII.

CIBL claims the trial judge erred by granting Mrs. Taylor's motion to file a second amended complaint which

included an action under the UTPA shortly before trial, particularly because Mrs. Taylor had not previously alleged overcharging for test results. We disagree.

Mrs. Taylor filed her initial complaint, which included a cause of action under the UTPA, in March 1993, and then amended her complaint in December 1993. The first amended complaint deleted all causes of action except negligence. This complaint specified CIBL engaged in the performance "of useless, inappropriate, worthless, and unnecessary testing." Mrs. Taylor's second amended complaint, served on January 18, 1995, alleged similar conduct violated the UTPA. The second amended complaint did not allege overcharging.

Since the allegations which formed the basis of Mrs. Taylor's negligence complaint against CIBL also formed the basis of her UTPA action, and CIBL was aware of these allegations in 1993, CIBL had sufficient notice of Mrs. Taylor's claims and was not prejudiced by the filing of Mrs. Taylor's second amended complaint in January 1995. Moreover, CIBL was not prejudiced by an allegation of overcharging since the second amended complaint did not allege overcharging. Rule 15(a), SCRCP (after an initial amendment, "a party may amend his pleading only by leave of court . . .; and leave shall be freely given when justice so requires and does not prejudice any other party").

## VIII.

CIBL argues it is not subject to the UTPA. We disagree.

First, CIBL contends providing medical laboratory services does not constitute a trade or commerce within the meaning of the UTPA. Specifically, it contends its services are professional and do not affect the public interest.

The UTPA declares unlawful "[a]ny unfair methods of competition and unfair or deceptive acts or practices within the conduct of any trade or commerce." S.C.Code Ann. § 39-5-20(a). "Trade and commerce" are defined as the "sale or distribution of any services." S.C.Code Ann. § 39-5-10(b).

The provision of *any* service constitutes commerce within the meaning of the UTPA. The statute does not exclude professional services from its definition. Accordingly,

even if medical laboratory services are considered professional services, they still constitute a trade within the meaning of the UTPA.

Moreover, since the performance of useless laboratory tests is capable of repetition by CIBL, the UTPA's public interest requirement is satisfied. *Daisy Outdoor Advertising v. Abbott,* 317 S.C. 14, 451 S.E.2d 394 (1996) (evidence of a potential for repetition, generally speaking, establishes the required public impact).

Second, CIBL argues it is exempt from the UTPA because it is regulated by state and federal agencies. We disagree.

Section 39–5–20(a) provides the UTPA does not apply to "[a]ctions or transactions permitted under laws administered by any regulatory body ... of this State or of the United States ...". We have interpreted this exemption to exclude from the UTPA those actions or transactions which are allowed or authorized by a regulatory agency or other statutes. *Ward v. Dick Dyer and Associates, Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1991).

CIBL's conduct which is alleged to violate the UTPA is neither an action nor a transaction which is specifically authorized by a regulatory agency. Accordingly, CIBL is not exempt from the UTPA.

## IX.

Mrs. Taylor argues the trial judge erred by requiring her to elect between remedies. We agree.

Election of remedies involves a choice between different forms of redress afforded by law for the same injury or different forms of proceeding on the same cause of action. It is the act of choosing between inconsistent remedies allowed by law on the same set of facts. Its purpose is to prevent double recovery for a single wrong. *Thompson v. Watts,* 281 S.C. 504, 316 S.E.2d 393 (1984). Election of remedies is not applicable where there are two separate causes of action, each based on different facts. *Jones v. Winn–Dixie Greenville,* 318 S.C. 171, 456 S.E.2d 429 (Ct.App.1995).

Mrs. Taylor's UTPA claim was based on allegations that Dr. Medenica ordered and CIBL performed and billed her for useless and unnecessary laboratory tests. Her negligence claim was based on allegations that Dr. Medenica provided reckless medical treatment. Because different conduct supports her UTPA and negligence causes of action, the trial judge erred by requiring Mrs. Taylor to elect between remedies under negligence and the UTPA.[11]

## X.

CIBL argues Mrs. Taylor incurred no ascertainable loss as a result of its actions and, therefore, she was not entitled to any recovery under the UTPA. Specifically, CIBL contends there is no evidence its alleged performance of and billing for worthless tests proximately caused Mrs. Taylor's injuries and corresponding actual damages of $543,614.10, which includes $489,379.72 in medical bills from Dr. Medenica and $54,234.47 in personal expenses incurred by the Taylors as a result of Dr. Medenica's treatment. At oral argument, CIBL agreed, at most, Mrs. Taylor's ascertainable losses under the UTPA were $36,232, which was CIBL's bill for its laboratory tests.

Under the UTPA "[a]ny person who suffers any ascertainable loss of money ... as a result of the use or employment by another person of an unfair or deceptive method, act or practice ... may bring an action individually, but not in a representative capacity, to recover actual damages." S.C.Code Ann. § 39–5–140(a). Actual damages include special or consequential damages which are the natural and proximate result of the deceptive conduct. *Fields v. Yarborough Ford, Inc.,* 307 S.C. 207, 414 S.E.2d 164 (1992).

While there is evidence CIBL conducted frequent, unnecessary, and, at times, worthless tests, there is no evidence which suggests CIBL should have foreseen Dr. Medenica would have relied on these tests to provide negligent medical care of Mrs.

---

11. CIBL argues the Taylors' second amended complaints do not delineate between facts in support of their negligence cause of action and facts in support of their UTPA cause of action. Rule 15(b), SCRCP, however, allows the pleadings to be freely amended in order to conform to the evidence at trial.

Taylor. Accordingly, we conclude CIBL's conduct did not cause Mrs. Taylor to incur $543,614.10 in ascertainable losses. Nonetheless, we find Mrs. Taylor incurred ascertainable losses of $36,242 as a result of CIBL's deceptive practices and she is entitled to recover those losses from the laboratory.[12]

## XI.

During jury instructions the trial judge defined preponderance of the evidence. In instructing the jury on punitive damages, the trial judge stated as follows:

Now, what would justify an award of punitive damages? It would be necessary for the plaintiff to prove by clear and convincing evidence that the defendant was more than merely negligent. The evidence must show that the defendant (sic) reckless, willful, or wanton and was acting with a conscious failure to exercise due care....

Dr. Medenica now argues the trial judge erred by refusing to define "clear and convincing" within the meaning of punitive damages. We disagree.

Our Court has previously held that when the trial judge first charges preponderance of the evidence, the jury can only be given the impression that "clear and convincing" means a higher degree of proof. A trial judge's failure to elaborate on "clear and convincing" is not error. *Deloach v. Beaufort Gazette*, 281 S.C. 474, 316 S.E.2d 139 (1984), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

Since the trial judge had previously defined preponderance of the evidence for the jury, his refusal to define "clear and convincing" was not error. *Id.* Further, the given charge properly instructed the jury on the standard for awarding punitive damages. *Miller v. The City of West Columbia*, 322 S.C. 224, 471 S.E.2d 683 (1996) (in order to establish the

---

12. Contrary to CIBL's assertion, it is improper to reduce Mrs. Taylor's actual damages by the $828 paid by her insurer. *In re W.B. Easton Construction Company, Inc. v. Gregory*, 320 S.C. 90, 463 S.E.2d 317 (1995) (compensation received by an injured party from a source wholly independent of the wrongdoer will not reduce the amount of damages owed by the wrongdoer); *Rattenni v. Grainger*, 298 S.C. 276, 379 S.E.2d 890 (1989) (tortfeasor's liability for damages is not reduced by underinsurance proceeds).

judge's refusal to give the requested charge deprived one of a fair trial, the refusal must have been both erroneous and prejudicial; when given instructions set forth the proper test for determining the issues, there is no prejudice).

## XII.

Dr. Medenica argues there was no clear and convincing evidence demonstrating he intentionally or willfully injured Mrs. Taylor and, therefore, the trial judge should have granted a directed verdict or judgment notwithstanding the verdict on punitive damages. We disagree.

In order for a plaintiff to recover punitive damages, there must be evidence the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights. *McGee v. Bruce Hospital System, supra; McCourt By and Through McCourt v. Abernathy,* 318 S.C. 301, 457 S.E.2d 603 (1995). A tort is characterized as reckless, willful or wanton if it was committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights. *Rogers v. Florence Printing Company,* 233 S.C. 567, 106 S.E.2d 258 (1958). A conscious failure to exercise due care constitutes willfulness. *McCourt, supra.* The plaintiff has the burden of proving punitive damages by clear and convincing evidence. S.C.Code Ann. § 15–33–135 (Supp.1995).

The record contains clear and convincing evidence that Dr. Medenica failed to exercise due care in treating Mrs. Taylor. This evidence includes, among others, the following: 1) knowingly failing to treat Mrs. Taylor with the standard adjuvant chemotherapy for primary breast cancer; 2) choosing to treat Mrs. Taylor with MMC even though there were no studies or literature supporting its use for adjuvant chemotherapy for breast cancer; 3) failing to inform Mrs. Taylor of the full extent of risk associated with MMC and failing to obtain Mrs. Taylor's informed consent to treatment with MMC; 4) failing to recognize Mrs. Taylor had contracted HUS until late February 1992; 5) ordering unnecessary and/or excessive tests, some of which caused Mrs. Taylor discomfort; and 6) billing Mrs. Taylor for the unnecessary tests. Accordingly, the trial judge properly denied Dr. Medenica's motion for a directed

verdict and motion for judgment notwithstanding the verdict on punitive damages. *Crossley v. State Farm Mutual Auto. Ins.*, 307 S.C. 354, 415 S.E.2d 393 (1992) (in deciding motions for a directed verdict and those for judgment notwithstanding the verdict, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party; if more than one inference can be drawn, the case must be submitted to the jury).

Dr. Medenica further argues the trial judge failed to properly apply the *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), factors in his post-trial review of Mrs. Taylors' punitive damage award. This issue was not raised below and is, therefore, procedurally barred. *McGee, supra.*

In any event, Dr. Medenica has not indicated which *Gamble* factor he contends the trial judge misapplied in conducting his post-trial review of the punitive damage award. However, in his order addressing the post-trial motions, the trial judge stated he specifically considered the eight *Gamble* factors in concluding the award of punitive damages was reasonable and rational. He separately listed the factors and applied the evidence from trial to most of those factors. Accordingly, there was no error. *Id.* (trial court is not required to make findings of fact for each factor to uphold punitive damage award); *McCourt, supra* (the amount of damages, actual or punitive, is largely within the discretion of the jury, as reviewed by the trial judge, and review by this Court is limited).

## XIII.

The Taylors argue the trial court erred by dismissing their children's action for loss of consortium. They agree there is no South Carolina precedent to support a child's cause of action for loss of parental consortium, but argue the Court should allow this claim. We disagree.

By enacting S.C.Code Ann. § 15–75–20 (1977), the legislature provided for loss of consortium actions for spouses. The statute has not been amended to provide a similar cause of action for children. Whether South Carolina should recognize a cause of action for loss of parental consortium is a matter best left to the discretion of the General Assembly.

## CONCLUSION

In accordance with the rulings above, this matter is affirmed in part, reversed on the issue of election of remedies, and remanded. A judgment of $36,242 actual damages under the UTPA shall be entered against CIBL. Since the trial judge has already ruled the violation of the UTPA was willful, the actual damages should be trebled.[13] Finally, the trial court shall consider Mrs. Taylor's application for attorney's fees and costs from the date on which she filed her second amended complaint alleging a violation of the UTPA.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

MOORE, A.C.J., and WALLER, A.J., L. CASEY MANNING and JAMES W. JOHNSON, Jr., Acting Associate Justices, concur.

---

13. Because Mrs. Taylor asserted she could recover her actual damages only once, we recognize Dr. Medenica will not pay any damages for ascertainable losses he caused Mrs. Taylor under the UTPA.