506 S.E.2d 516

**Michael PIKE, Personal Representative of the Estate of Melissa P. Pike, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION, Appellant.**

No. 2884.

Court of Appeals of South Carolina.

Heard Sept. 1, 1998.

Decided Sept. 28, 1998.

Rehearing Denied Nov. 19, 1998.

William McBee Smith, of Smith & Haskell, Spartanburg, for appellant.

James Fletcher Thompson, of Thompson & Sinclair, Spartanburg, for respondent.

HOWELL, Chief Judge:

On June 24, 1992, Melissa Pike was involved in an automobile collision as she attempted to turn left from Park Road onto United States Highway 176 (hereinafter "the intersection") in Spartanburg, South Carolina. She died the next day. Melissa's husband, Michael, in his capacity as the personal representative of her estate, brought this wrongful death action against the South Carolina Department of Transportation (SCDOT). Michael alleged that a directional sign, reading "CHAPMAN HIGH SCHOOL," obstructed Melissa's view of the oncoming vehicle and that the intersection was negligently maintained. The jury found SCDOT liable for $730,-000. SCDOT appeals the trial court's denial of its various trial motions. We affirm.

## I.

SCDOT argues that the lower court erred by not granting its motions for a directed verdict and JNOV, or in the alternative, for a new trial because it qualified for discretionary immunity under the South Carolina Torts Claims Act. *See* S.C.Code Ann. §§ 15–78–10 to 15–78–200 (Supp.1997). We disagree.

The Tort Claims Act waives immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties. *See* S.C.Code Ann. §§ 15–78–20(b) and 15–78–40 (Supp.1997). There are, however, several exceptions to this waiver of immunity, *see* S.C.Code Ann. § 15–78–60 (Supp.1997), which amount to affirmative defenses, *see, e.g., Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 430, 445 S.E.2d 439, 440 (1994). For example, a governmental entity is not liable for a loss resulting from:

the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee; [or]

. . .

[the] absence, condition, or malfunction of any sign, signal, warning device, illumination device, guardrail, or median barrier unless the absence, condition, or malfunction is not corrected by the governmental entity responsible for its maintenance within a reasonable time after actual or constructive notice.... Nothing in this item gives rise to liability arising from a failure of any governmental entity to initially place any of the above signs, signals, warning devices, guardrails, or median barriers when the failure is the result of a discretionary act of the governmental entity.

S.C.Code Ann. § 15–78–60(5) & (15) (Supp.1997).

This appeal centers upon a review of directed verdict, JNOV, and new trial motions. Unlike a court examining a burden of proof issue, a court analyzing directed verdict, JNOV, and new trial motions is concerned solely with the existence of evidence and not with its weight. *See Connelly v. Wometco Enterprises, Inc.,* 314 S.C. 188, 191, 442 S.E.2d 204, 206 (Ct.App.1994). When ruling on motions for directed verdict and JNOV, the trial court and this Court must view the evidence and the inferences reasonably drawn therefrom in the light most favorable to the party opposing the motions. *See Strange,* 314 S.C. at 429, 445 S.E.2d at 440 (affirming the denial of SCDOT's directed verdict motion, where evidence viewed in light most favorable to plaintiff demonstrated that SCDOT did not weigh competing consideration or use accepted professional standards). This Court must affirm a trial judge's denial of a directed verdict motion when there is evidence to support the ruling below. *Id.* Accordingly, we must review the evidence to determine whether the trial court properly submitted the case to the jury.

To establish discretionary immunity, the governmental entity must prove that, when faced with alternatives, it actually weighed competing considerations and made a conscious choice. *See, e.g., Summer v. Carpenter,* 328 S.C. 36, 46, 492 S.E.2d 55, 60 (1997). "Further, the governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue." *Foster v. South Carolina Dep't of Highways & Public Transp.,* 306 S.C. 519, 525, 413 S.E.2d 31, 35 (1992).

At trial, Michael sought to prove that SCDOT negligently failed to provide adequate visibility for Melissa at the intersection.[1] Before Melissa's accident, SCDOT received a complaint about the intersection from James Everhart. On a map showing the layout of the intersection, Everhart wrote:

> The newly erected Chapman High School sign and the tree limbs over the sidewalk a little farther up toward Asheville make it difficult for one to see the traffic coming from toward Asheville. Therefore, crossing this intersection is a little dangerous.

> Removal of sign, trimming limbs and installing a traffic light might be the answer to this dangerous situation.

In response to Everhart's letter, SCDOT sent Rodney Wilson, a "civil engineer associate," to the site. Even though motorists had to look beneath the sign to see the oncoming traffic, Wilson noted, "First check in Nov. 1990—sign is high enough not to obscure sight. Tree limbs were bare—no problem." Wilson returned to the site on July 31, 1991, when he observed that "even with foliage, tree limbs did not block sight distance. Visibility is approx. 500'–600' to north." To estimate the sight distance needed to cross the intersection safely, Wilson used a simple "rule of thumb." According to this "rule of thumb," if the sight distance exceeds ten times the speed limit, then the visibility is sufficient. At this location, the speed limit was 40 m.p.h. Wilson concluded that his estimate of 500 to 600 feet at this site passed the "rule of thumb" test. Thus, SCDOT did not move the sign.[2]

---

1. Michael also attempted to establish that SCDOT was negligent for failing to erect a traffic light at the intersection. *But see* § 15–78–60(5) & (15) (liability for absence of any signal, warning device, or illuminating device does not give "rise to liability arising from a failure of any governmental entity to initially place any of the above ... signals [or] warning devices...."). Because we find SCDOT was not entitled to a directed verdict on the visibility issue, we do not need to address the traffic light issue. *See Anderson v. South Carolina Dept. of Highways & Public Transp.*, 322 S.C. 417, 420, 472 S.E.2d 253, 254 (1996) ("the appellate court will find it unnecessary to address all the grounds appealed where one requires affirmance." (citation omitted)).

2. SCDOT also performed some visibility measurements after Melissa's accident. However relevant the subsequent measurements were to establishing negligence on the part of SCDOT or Melissa, the subse-

Michael claimed that Wilson's inspection was not adequate to cloak SCDOT with discretionary immunity. First, Michael questioned the prudence of SCDOT sending just Wilson, who was not an engineer, to investigate the intersection. The testimony of Wilson's supervisor, engineer Gary Thompson, supported Michael's position that Wilson was not qualified to calculate proper sight distances.

Next, Michael attacked the process that Wilson used to determine whether the sight distance was adequate. Michael called Dr. Robert Roberts, an expert in the field of traffic engineering, to establish that SCDOT's investigation violated "accepted engineering practices." Dr. Roberts noted that Wilson did not utilize accepted engineering principles in analyzing the sight distance. Roberts testified that Wilson should not have guessed at the actual sight distance, but should have obtained the exact sight distance using a tape measuring wheel. Further, Dr. Roberts questioned the appropriateness of Wilson's using only the "rule of thumb" to determine whether the sight distance was adequate. According to Mr. Thompson and Dr. Roberts, the "rule of thumb" could not take into account the width and slope nor the prevailing speed of the road. Even SCDOT's expert witness, Dr. James Clark, agreed that using only the "rule of thumb" could be problematic, stating, "I think the danger ... is being able to recognize when to apply that 'rule of thumb' and when you need to do a little bit more in-depth work."

Even though SCDOT presented evidence that could dispute some of Michael's evidence, Michael produced more than enough evidence for the judge to send the issue of discretionary immunity to the jury. Again, the trial court and this Court must simply determine whether a question of fact exists. In this case, Michael presented evidence that SCDOT failed to utilize accepted professional engineering standards in analyzing the visibility of the intersection.[3]

---

quent measurements are not relevant for our discussion of discretionary immunity.

3. Although *Strange* makes it clear that the burden of establishing the discretionary exception is upon the governmental entity asserting it, 314 S.C. at 430, 445 S.E.2d at 440, SCDOT challenges how much evidence it must produce to qualify for immunity. SCDOT argues that a

## II.

SCDOT asserts that the trial court erred by admitting evidence of nineteen prior accidents at and near the intersection, when only one of the accidents was similar to Melissa's. We disagree.

"All relevant evidence is admissible. . . ." Rule 402, SCRE. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Rule 403, SCRE.

■ Generally, the trial court determines relevancy in its discretion. *Horry County v. Laychur,* 315 S.C. 364, 369, 434 S.E.2d 259, 262 (1993). These discretionary decisions, "including the admission and rejection of testimony, . . . will not be disturbed on appeal absent an abuse of that discretion or the commission of a legal error that results in prejudice for appellant." *Baber v. Greenville County,* 327 S.C. 31, 41, 488 S.E.2d 314, 319 (1997).

■ Michael introduced the previous accidents to demonstrate that SCDOT, the agency charged with determining when and where to install traffic lights, acted negligently by not including a traffic light at the intersection in question. To prove negligence, Michael argued that SCDOT deviated from *The Manual on Uniform Traffic Control Devices,* which sets the standard for engineering practices regarding intersection safety. *The Manual on Uniform Traffic Control Devices* establishes a number of tests, also called warrants, that SCDOT should consider when deciding whether to place a

---

"some evidence" standard should be used, whereby it would gain immunity if it merely produced more than a scintilla of evidence that it weighed competing considerations and utilized accepted professional standards. As discussed above, our duty in this case is to determine whether there was any evidence creating a question of fact for the jury. SCDOT's argument regarding burden of proof is unnecessary to the disposition of this case on appeal. Consequently, we decline to address it.

traffic light at an intersection. One of these tests focuses on whether there was a minimum of five accidents per year that could be corrected by a traffic light. This test does not mandate that all the accidents happen in the exact same manner but merely questions whether the accidents take place in the same intersection and whether they were preventable. Moreover, Mr. Thompson testified that less than five accidents in any given year could trigger the necessity for a traffic light under some circumstances.

Also, Mr. Thompson testified that there were five accidents in 1990. In addition, while there was only one rear-end collision in 1991, the accident reports in the record show that six accidents occurred in the calendar year 1990 at the intersection. Of these, four occurred from either left turns onto US176 or attempts to cross the intersection. One accident occurred as a result of an attempt of a car to make a right turn onto US176 from Park Road. The remaining accident was a rear-end collision occurring while a car was stopped at the intersection.

In 1989, the accident reports reveal six accidents at or near the intersection. Three accidents occurred while a car was attempting to turn left from Park Road onto US176 or cross the intersection. One accident was a result of a drunk driver colliding with a median at the intersection. The other two accidents happened near the intersection, but not at the intersection itself.[4]

Furthermore, during the nine month period from September 1987 until May 1988, the accident reports describe six accidents at or near the intersection. One of these accidents occurred on US176 just before the intersection.[5] Another accident was a rear end collision into a car stopped at the intersection. The remaining four accidents were angle collision accidents occurring while a car was either attempting to

---

**4.** One of these occurred while a car was attempting a left turn onto US176 from a private drive. In the other accident, a car simultaneously attempted a left turn from County Road onto US176 and a lane change.

**5.** In this accident, a car driving in the left lane improperly changed lanes, crashing into a car in the right lane.

turn left at the intersection, crossing the intersection, or attempting a u-turn at the intersection.

At a minimum, there were five accidents in 1990 that occurred as cars were entering the intersection. In the light most favorable to the plaintiff, the prior accidents were relevant to establish that the standards of *The Manual on Uniform Traffic Control Devices* may have been met. As a result, the trial court correctly ruled that the prior accidents, even though some were dissimilar to Melissa's, were relevant and admissible.

Nevertheless, even if the trial court erred in admitting the prior accidents, SCDOT must establish that the evidence was prejudicial. *See JKT, Co. v. Hardwick,* 274 S.C. 413, 419, 265 S.E.2d 510, 513 (1980), *appeal after remand,* 284 S.C. 10, 325 S.E.2d 329 (Ct.App.1984) (An error not shown to be prejudicial does not constitute grounds for reversal.). In response to questions about the prior accidents at the intersection, Thompson claimed that only one of the previous accidents occurred in the same way as Melissa's. Thompson adequately distinguished the prior accidents and, thereby, eliminated any possibility of prejudice.

### III.

SCDOT also contends that the trial court erred by permitting Michael to enter into evidence five letters [6] to SCDOT from concerned residents and politicians complaining about the intersection. However, this argument is not preserved for review on appeal.

For an issue to be preserved for appeal, it must have been raised to and ruled upon by the trial court. *Jackson v. Speed,* 326 S.C. 289, 306–307, 486 S.E.2d 750, 759 (1997). Moreover, one may not argue one ground on the admissibility of evidence at trial and an alternate ground on appeal. *See Taylor v. Medenica,* 324 S.C. 200, 216, 479 S.E.2d 35, 43

---

**6.** In addition to the Everhart letter, Michael introduced letters from Senator Elizabeth Patterson, requesting a feasibility study for installing a traffic light; Representative Joseph Petty, also requesting a study for installing a traffic light; Joan Rector, specifically asking for a traffic light at the intersection; and Mr. and Mrs. Robert Berg, parents of a Chapman High School student, begging for SCDOT to place a traffic light at the intersection.

(1996), *appeal after remand,* 331 S.C. 575, 503 S.E.2d 458 (1998). In this case, SCDOT's only specific objection on the record was based on hearsay. Therefore, SCDOT's prejudice argument is not properly before this Court.

## IV.

Next, SCDOT argues that the trial court erred in allowing the question of Melissa's negligence to go to the jury.[7] It asserts the "undisputed testimony" supports the "one reasonable inference" that Melissa was the most culpable party. We disagree.

Ordinarily, the question of the plaintiff's negligence is a question of fact for the jury to decide. *Brown v. Smalls,* 325 S.C. 547, 558, 481 S.E.2d 444, 450 (Ct.App.1997). When deciding whether to grant a directed verdict motion, the court must remember that "[c]omparison of a plaintiff's negligence with that of the defendant is a question of fact for the jury to decide. A directed verdict is warranted only if the only reasonable inference that may be drawn from the evidence is that the plaintiff's negligence exceeded fifty percent." *Creech v. South Carolina Wildlife & Marine Resources Dept.,* 328 S.C. 24, 32–33, 491 S.E.2d 571, 575 (1997) (citations omitted).

In support of its argument, SCDOT claims that Melissa did not pull up far enough to see the oncoming traffic. To establish Melissa's negligence, SCDOT presented testimony that there were no sight obstructions at the stopping point of the intersection. In addition, witnesses testified that if a driver pulled up far enough, the driver could see the top of the hill (approximately 1,100 feet).

Nevertheless, Thompson testified that a driver would have to pull up to the edge of the sidewalk, past the stop sign, to see to the top of the hill.[8] Thompson also admitted that, in

---

7. The parties refer to Melissa's negligence as "contributory negligence." In *Nelson v. Concrete Supply Co.,* 303 S.C. 243, 399 S.E.2d 783 (1991), the Supreme Court abrogated the doctrine of contributory negligence in favor of comparative negligence. We assume the parties intended the phrase "comparative negligence."

8. Other witnesses differed with Thompson's assessment, but we are to view the evidence in the light most favorable to Michael. *See Strange,* 314 S.C. at 429–430, 445 S.E.2d at 440.

some cases, drivers would have to extend the front of their car beyond the sidewalk to see to the top of the hill and that such action would not be safe.

To further discredit SCDOT's argument that Melissa was negligent, Michael introduced evidence that SCDOT's sight distance was calculated from an unreasonable vantage point. Michael placed into evidence a manual for beginning drivers that directs motorists to "stop before reaching a stop line or a pedestrian crosswalk if there is one and remain stopped until you may move safely." Thompson, SCDOT's own witness, admitted that to reach the sidewalk Melissa would have had to pull her car fourteen feet past the stop sign. In addition, Dr. Roberts testified that even though there was no paint on the road, there still was a crosswalk running from sidewalk to sidewalk across the intersection that Melissa approached. *See* S.C.Code Ann. § 56–5–500 (1991) ("A 'crosswalk' is that part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway measured from the curbs or in the absence of curbs from the edges of the traversable roadway. . . ."). Finally, according to Michael's expert, the sign would have obstructed Melissa's line of sight unless she pulled into the intersection.

Michael presented enough evidence for a jury to determine that Melissa was not over fifty percent negligent in causing the accident. Therefore, we find no error in the trial court submitting this issue to the jury.

## V.

Finally, SCDOT claims that the reenactment of the $250,000 cap for damages under the Tort Claims Act requires us to reduce the jury's verdict. We disagree.

The jury rendered a verdict in this action on July 18, 1996. On June 14, 1997, after the notice of appeal and the initial briefs of both parties were filed, the Governor signed into law Act No. 155, 1997 Acts 1001, 1611. Part II, section 55 of the act ("the Proviso") reinstated the $250,000 cap that previously limited recovery against the State under the Tort Claims Act. *Id.* at 1570.[9] Section F of the Proviso provides, in pertinent part:

---

**9.** In *Southeastern Freight Lines v. City of Hartsville,* 313 S.C. 466, 443 S.E.2d 395 (1994), *reh'g denied,* May 18, 1994, the Supreme Court

Except where otherwise provided, this section takes effect upon approval by the Governor and applies to claims or actions pending on that date or thereafter filed, except where final judgment has been entered before that date.

*Id.* at 1571–1572.

SCDOT argues that the Pike appeal was an "action pending" on June 14, 1997 and, therefore, the Proviso limits Michael's recovery to $250,000. Nonetheless, "final judgment," as used in the Proviso, refers to a jury verdict.

▮▮▮▮▮ Although S.C.Code Ann. § 15–78–20(f) (Supp. 1997) [10] requires us to construe the Tort Claims Act's provisions liberally to limit the State's liability, legislative intent must prevail if it can be reasonably discovered in the language used. *See Lewis v. Gaddy,* 254 S.C. 66, 71, 173 S.E.2d 376, 378 (1970). If we were to adopt SCDOT's argument and find that an action is pending even through appeal, then we would essentially render the "final judgment" exception in the Proviso meaningless. Case law, however, mandates that " 'a statute should be so construed that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous.' " *Matter of Decker,* 322 S.C. 215, 219, 471 S.E.2d 462, 463 (1995) (citations omitted). The only way to give effect to both the

---

interpreted the Uniform Contribution Among Tortfeasors Act, *See* S.C.Code Ann. § 15–38–10 *et seq.* (Supp.1997), to repeal the damage limits in the Tort Claims Act, S.C.Code Ann. § 15–78–120(a)(1) & (a)(2). *Southeastern Freight Lines,* 313 S.C. at 469, 443 S.E.2d at 397. Additionally, in *McClain v. South Carolina Dep't of Educ.,* 323 S.C. 132, 473 S.E.2d 799 (1996), *reh'g denied* Aug. 23, 1996, though limiting *Southeastern Freight Lines* to causes of action filed before July 1, 1994, the Supreme Court noted that this time limited repeal applied even in circumstances where the Uniform Contribution Among Tortfeasors Act did not apply. *McClain,* 323 S.C. at 136, 473 S.E.2d at 801. Further, in *Knoke v. South Carolina Dep't of Parks, Recreation, and Tourism,* 324 S.C. 136, 478 S.E.2d 256 (1996), *reh'g denied* Dec. 5, 1996, the Supreme Court held that *"Southeastern* and *McClain* apply as well to the $500,000 per occurrence cap in § 15–78–120(a)(2)...." *Knoke,* 324 S.C. at 141, 478 S.E.2d at 258. The original complaint in this action was filed on June 23, 1994.

**10.** "The provisions of this chapter establishing limitations on and exemptions to the liability of the State, its political subdivisions, and employees, while acting within the scope of official duty, must be liberally construed in favor of limiting the liability of the State." S.C.Code Ann. § 15–78–20(f) (Supp.1997).

"pending action" and "final judgment" language is to interpret the Proviso so that "final judgment" as used in the amendment refers to a final decision or verdict in the lower court, an interpretation frequently appearing in statutes and other case law. *See, e.g.*, S.C.Code Ann. §. 14–17–540(1)(g) (1976) (requiring maintenance of a "Court of Common Pleas Journal" which shall include, inter alia, "final judgments"); Rule 803(22), SCRE (creating a hearsay exception for "[e]vidence of a final judgment ... entered after a trial or upon a plea of guilty.... The pendency of an appeal may be shown but does not affect the admissibility."); *Link v. School Dist. of Pickens County*, 302 S.C. 1, 6, 393 S.E.2d 176, 179 (1990) (plaintiff may wait until "final judgment" to appeal intermediate orders necessarily affecting the judgment). Accordingly, the Proviso does not apply to the jury verdict herein, and the award of $730,000 to Michael Pike stands.

Therefore, the trial court's denials of SCDOT's motions for directed verdict, JNOV, and new trial are

**AFFIRMED.**

CURETON and GOOLSBY, JJ., concur.