538 S.E.2d 656

Geraldine ABRAHAM; Marie Brice Adams; James R. Archie; Diane N. Austin; Jeannete P. Austin; Thurston Bagnal; Ellen S. Bailey; Shelley B. Baker; Alice G. Balot; Dedra Baskin; Horace M. Bass; Helen P. Becote; James Cal Bell; Othella R. Bernard; Johnnie T. Bias; John Bodie; Richard L. Boland; Katherina W. Bolden; Jewell B. Bounds; Frank A. Boxx; Patricia Bradley; Linda M.W. Bratton; Ann T. Bridges; Robert C. Brown; Rosalind Patton Brown; Burke Brown; Hey-

ward Brunson; Warren A. Burch; Pamela B. Burnett; Mary H. Cawthon; Clarence A. Clark, Jr.; James F. Clark; Rance C. Cobb; Gary G. Cook; Dr. Sandra C. Cook; Jeannie Bates Croxton; Bernetha L. Culbreath; Robert W. Danforth; Ron M. Davis; Sylvia D. Deal; Wadonna Wilson Dedmondt; Loretta A. Demko; Randolph H. Dillingham; Rex M. Divine; John W. Dodge; William K. Dreyer; John B. Eddings; Eileen L. Englert; Darlene English–Davis; Jacqueline D. Farr; Johnny Floyd; Kathy Freeman; Dr. Ruth Fritts; Cecil B. Gainey, Jr.; Juanita Rose Gilbert; Otis Allen Givens, Jr.; Nancy B. Glenn; John W. Glover; Roger W. Goodman; Alfonzo Greene; James L. Hall; Lucius D. Hand; Mary Gene Hayes; Arnold Brooks Henderson, Jr.; Troy Henegan; Jeffrey M. Holbrooks; Toni S. Hopper; Michael S. Houck; Mary M. Hudson; Patricia Hudson; Sandra M. Hummel; James Leonard Jeffcoat; Grayson P. Jefferies, Jr.; Linda D. Johnson; Etta Jane Jones; Elois Chappell Jones; Arnold E. Karr; Bobby L. Kinard; Deloris LaBrew; Mary C. Lowder; Thomas E. Malik; William Terry Marinko; Andrew E. Marshall; Myrtle J. Marshall; Willie M. McKay; John Richard McLeod; Harry W. Medlin; Grace M. Mitchum; Robert W. Mobley; Thomas E. Moore; Johnny L. Murdaugh; Theron Mark Phillips; Adaline J. Pyatt; Charlotte M. Ramsey; Max Dean Randolph; Alma L. Reid; Steve Scott Rexrode; Gerald B. Ritchie; Charles E. Roache; Nathan Robinson; Helen D. Rogers; Leonard P. Rogers; Eunice Rowell; Rose M.B. Ruger; Hoyt Ray Sharpe; Henry J. Siegfried; Maurie M. Singletary; Carolyn McIver Smith; Luther E. Smith; Mary V. Starks; Boyd S. Stokes; William A. Strickland; Howard J. Teufel; David A. Theodore; Donald C. Thomas; Beverly Thompson; Jacqueline L. Venning; W. Daniel Vinson, III; Charles L. Williams; Maggie L. Williams; Loretta R. Wilson; Yvonne Williams Wilson; Paula L. Woodlief; Carol R. Wright; James Byron Zuver, Sr., Appellants,

v.

PALMETTO UNIFIED SCHOOL DISTRICT NO. 1 and South Carolina Department of Corrections, Respondents.

No. 3239.

Court of Appeals of South Carolina.

Heard June 8, 2000.

Decided Sept. 11, 2000.

Rehearing Denied Dec. 16, 2000.

W. Allen Nickles, III, of Gergel, Nickles & Solomon, of Columbia, for appellants.

Michael H. Montgomery, of Montgomery, Potts, Pickren & Novak, of Columbia, for respondents.

SHULER, Judge:

In this schoolteacher wage dispute, the trial court granted summary judgment to defendants Palmetto Unified School District No. 1 and South Carolina Department of Corrections ("Employers"). Geraldine Abraham, et al. (collectively "Employees") appeal. We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

In 1981, the General Assembly established a "special statewide unified school district" within the Department of Corrections known as Palmetto Unified School District No. 1. *See* S.C.Code Ann. § 24–25–10 (1989). The District, designed to "enhance the quality and scope" of inmate education with an eye toward reintegrating offenders into the community, operates under the control of a Board of Trustees supervised by the Department of Corrections. *Id.* at § 24–25–20; *see* S.C.Code Ann. § 24–25–40 (1989 & Supp.1999). In establishing the District, the Legislature specifically provided for a "twelve-month school program [with] teachers' pay schedule based on the state and average school supplement pay scales." S.C.Code Ann. § 24–25–70(7) (1989 & Supp.1999). The Legislature further required that teachers hired to work in the District "be employed, supervised, and terminated" according

to the policies and procedures of the Department of Corrections. S.C.Code Ann. § 24–25–90 (1989).

Employees are all current or former educators working as teachers in the South Carolina correctional system. On September 25, 1995, Employees filed a complaint, amended on October 12, alleging Employers failed to compensate them as provided by law.[1] Employees subsequently moved for summary judgment on December 11, 1996; the trial court denied the motion on February 24, 1998. Thereafter, on March 20, Employers filed a motion for summary judgment. Following a hearing, the trial court granted their motion, finding Employees "can prove no set of facts that would entitle them to any relief." Pursuant to Rule 59(e), SCRCP, Employees filed a timely motion to reconsider. On March 17, 1999, the trial court issued an amended order confirming summary judgment to Employers. This appeal followed.

## LAW/ANALYSIS

### Standard of Review

■ A motion for summary judgment should be granted when it is clear there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Adamson v. Richland County Sch. Dist. One*, 332 S.C. 121, 503 S.E.2d 752 (Ct.App.1998). In particular, summary judgment is appropriate where the facts of the case are undisputed. *See Trico Surveying, Inc. v. Godley Auction Co.*, 314 S.C. 542, 544, 431 S.E.2d 565, 566 (1993) ("Summary judgment can be granted when plain, palpable and indisputable facts exist on which reasonable minds cannot differ.") (quoting *Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992)); *Staubes v. City of Folly Beach*, 331 S.C. 192, 500 S.E.2d 160 (Ct.App.1998). The parties herein concede no issues of material fact exist. Accordingly, the questions presented for this Court's determination involve the purely legal concern of whether Employees are in fact paid according to law.

---

1. By consent, various plaintiffs were added and/or deleted in orders filed in August 1997, and March and November 1998.

## I. Twelve–Month Work Schedule

██ Employees first argue they are not paid as required by law because Employers have failed to compensate them for their twelve-month work schedule. Employees, who by the terms of their employment agree to teach five days a week year-round, claim Employers are improperly deducting holidays and annual leave from the number of work days for which they must account. We disagree.

The total number of days available for Employees to work in any given year is 261 (365 total days per year minus 104 weekend days each year). Employers calculate Employee pay based on the fact that, of this total, Employees must be present physically on the job for 235 days each year (261 work days minus 15 days of annual leave plus 11 official state holidays). Employees contend this method of determining compensation means they are not getting paid for 26 days of "work" time that must be accounted for (either by annual leave or an official holiday). Employees' argument, however, misapprehends the nature of their base pay determination.

When the District initially was formed, the 235–day figure was used to compute Employees' annual compensation because "[i]t was the ratio of Palmetto Unified School District's accountable years and work days to the ratio of the geographic district teachers' work year and work days within that work year." In other words, the ratio of days actually worked by Employees (235 out of a possible 261 days available in a 52–week work year) is exactly the same as that for public school teachers (190 days out of 210 available in a 42–week work year). Regarding the comparison to public school teachers, Employers' expert Carl Garris noted:

> I'm saying that there's three ways you can look at it. But in any event, you've got ... your measuring rod has to be the same. You've got to compare apples to apples or oranges to oranges. If you want to talk about ... base it on work days, the ratio is 190 to 235. If you want to talk about the total period of time in which they are required to carry out their work, then the comparison is 210 days to 26[1] days. If you want to base it on weeks, it's 42 weeks

versus 52 weeks, and under all three scenarios, the ratio comes out to be 124 percent.

(Garris Dep. at 37).

Another expert, Dr. Jesse Teel, reached a similar conclusion:

> Department of Corrections teachers work 235 days per year, which is 124 percent of the 190 day work year that South Carolina public school teachers perform. Additionally, Department ... teachers['] base pay is approximately 124 percent of base pay for ... public school teachers with the same credentials and experience. Further, both Department ... teachers and public school teachers are not required to work on holidays when their respective schools are closed ... and neither group's pay is reduced for not working these holidays as would be the case with hourly workers.... Last, Department ... teachers receive 15 days of vacation time each year, and their pay is not reduced for not working these days. In fact, Department ... teachers can accrue up to 45 vacation days and be paid for these days if they leave the Department of Corrections. This obviously implies that they already receive pay for their vacation days.

(Teel Aff. at 3–4). Finally, Sam O'Kelley, Deputy Director of Administration for the Department of Corrections, confirmed the testimony of both experts:

> [I]t was a way of generating the pay schedule. In effect, what we did is we took the State [public school teacher] minimum, which was based on 190 days, got the daily rate of pay, and then simply multiplied that figure by 235 and that would have given us the annualized equivalent ....

(O'Kelley Dep. at 11).

Without question, Employees are paid semi-monthly (twenty-four times a year) on an annual, salaried basis. (Coleman Dep. at 69.) In other words, Employees agree to "perform a job with certain responsibilities for a specified dollar amount over a period of time," in this case one year. (Garris Dep. at 30.) Accordingly, they are paid the same amount each pay period regardless of whether they have taken annual leave or an official holiday. (Coleman Dep. at 70; Strawhorn Dep. at 46.) Because Employees are compensated at a rate that is

124% of public teacher salaries for working a schedule that is 24% longer, we find no merit in their assertion of pay inequity. We therefore affirm the grant of summary judgment on this issue.

## II. Breach of Contract

■ Employees next argue Employers' alleged violations of their statutory rights to compensation based on a twelve-month schedule, state mandatory minimum salary, and entitlement to annual leave constitute a breach of contract. Because Employees failed to prove the existence of any contracts of employment, this issue is meritless.

Unlike public school teachers, teachers within the Department of Corrections do not operate under written employment contracts. Employees, however, assert the absence of written contracts does not deprive them "of contractual rights based in unequivocal policy and mandatory law." While this indeed may be true, Employees must still carry their burden of producing evidence of employment contracts, either express or implied. *See Prescott v. Farmers Telephone Co-op., Inc.*, 335 S.C. 330, 336, 516 S.E.2d 923, 926 (1999) ("In order to prove the existence of a definite contract of employment, the employee must establish all of the elements of a contract.").

Employees contend various statutory provisions governing compensation, salary adjustments, and annual leave evidence contracts of employment with Employers. We disagree. ·

■ In *Alston v. City of Camden*, 322 S.C. 38, 45, 471 S.E.2d 174, 177 (1996), our supreme court stated that "South Carolina law is clear that public employees generally have no contractual rights in their employment merely by virtue of a statute describing the terms of that employment."[2] Furthermore, the court explained, there is a presumption in this state "that statutes regulating salaries and benefits of public em-

---

**2.** Employees' reliance on *Armstrong v. Sch. Dist. Five of Lexington and Richland Counties*, 26 F.Supp.2d 789 (D.S.C.1998), to support their assertion that *Alston* is inapplicable is misplaced. In *Armstrong*, the plaintiffs were public school teachers operating under *written contracts* of employment, a fact the *Armstrong* court noted in its opinion. *See id.* at 795 ("[U]nlike the Plaintiffs here, the *Alston* employees had no employment contracts and no statute which required the issuance of contracts.").

ployees do not create contractual rights for the employees whose salaries and benefits the statutes set." *Id.* Finally, the court cited the general rule applicable when analyzing whether a private contract arises from statutory law: "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Id.* at 46, 471 S.E.2d at 178 (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)). As none of the statutes cited by Employees evidences *any* intent by the General Assembly to create contractual rights therein, we must presume they are mere declarations of governmental policy rather than codifications of vested rights giving rise to private causes of action. Accordingly, because Employees failed to prove any contracts of employment with Employers, the trial court did not err in granting summary judgment to Employers on this issue.[3]

### III. Section 24–25–70(7)

■ Next, Employees assert the trial court erred in failing to find the express terms of § 24–25–70(7) require Employers to pay them a salary supplement based on the statewide school district average in addition to the state mandatory

---

**3.** We note here that the trial court, in summarily rejecting Employees' breach of contract claims, primarily relied upon the validity of the disclaimer in the Department of Corrections' employee handbook. On appeal, however, Employees do not argue the handbook gave rise to any contracts of employment. Employees, therefore, have now abandoned the handbook argument. *See, e.g., First Sav. Bank v. McLean,* 314 S.C. 361, 444 S.E.2d 513 (1994) (issues not argued in the appellate briefs are deemed abandoned). Furthermore, even if they had not abandoned the handbook theory, we would be unable to address it as Employees failed to include the entire handbook in the record on appeal. *See Fleming v. Borden, Inc.,* 316 S.C. 452, 464, 450 S.E.2d 589, 596 (1994) ("[T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced.... Thus, ... the entire handbook, including any disclaimer, should be considered in determining whether the handbook gives rise to a promise, an expectation and a benefit.") (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers,* 13 Indus. Rel. L.J. 326, 375–76 (1991–92)); *Crestwood Golf Club, Inc. v. Potter,* 328 S.C. 201, 493 S.E.2d 826 (1997) (appellant bears the burden of providing the appellate court with a sufficient record to review any assertions of error).

minimum salary. Enacted in 1981, section 24–25–70 directs the District's governing Board to discharge the following administrative function:

> [E]stablish a twelve-month school program and teachers' pay schedule based on the state and average school supplement pay scales[.]

S.C.Code Ann. § 24–25–70(7) (1989 & Supp.1999).[4] Employees do not dispute that Employers base their pay schedules on the state minimum as prescribed by law. Rather, Employees assert § 24–25–70(7) also imposes on Employers a requirement to pay them a salary supplement based on the "average school supplement." We agree.

Initially, we believe a brief explication of how public school teachers in the state are paid will be helpful to our analysis. Public education in South Carolina is funded with resources from the federal, state, and local governments. *See Abbeville County Sch. Dist. v. State,* 335 S.C. 58, 515 S.E.2d 535 (1999). State funds are disseminated primarily through two mechanisms established by the General Assembly: the Education Finance Act of 1977 (EFA) and the 1984 Education Improvement Act (EIA). *See id.;* S.C.Code Ann. § 59–20–10 *et seq.* (1990 & Supp.1999); S.C.Code Ann. §§ 59–21–420 to –450 (1990 & Supp.1999).

The EFA mandates a statewide minimum salary schedule for certified instructional personnel. *Richland County Sch. Dist. Two v. South Carolina Dep't of Educ.,* 335 S.C. 491, 517 S.E.2d 444 (Ct.App.1999); *see* S.C.Code Ann. §§ 59–20–10 *et seq.* (1990 & Supp.1999). To accomplish this goal, the EFA distributes monies to public school districts using a "wealth-sensitive" formula, which results in poorer districts receiving proportionately more state funding than wealthier ones. *See Abbeville County,* 335 S.C. at 64, 515 S.E.2d at 538; *Richland County v. Campbell,* 294 S.C. 346, 364 S.E.2d 470 (1988). Funds under the EIA, on the other hand, are distributed without regard to a district's tax base. *Abbeville County,* 335 S.C. at 64, 515 S.E.2d at 538. In effect, the EIA amended the EFA to provide additional state funds to school districts in

---

4. This provision remained without modification in 1993 when the Department of Corrections became a cabinet agency. *See* S.C. Ann. § 24–25–70(7) (1989 & Supp.1999).

order to raise public teacher salaries to the southeastern average. *See Richland County Sch. Dist. Two,* 335 S.C. at 497, 517 S.E.2d at 448; S.C.Code Ann. § 59–20–50(4)(b) (1990 & Supp.1999). As noted by Employers' expert Carl Garris, the EFA and EIA now operate in tandem to establish the "state minimum" salary for public school teachers. (Garris Dep. at 51, 53).

Many school districts, however, augment the required state minimum salary with additional "local supplements." Such supplements, clearly voluntary and thus contingent upon each district's local tax base, are utilized to meet a particular district's needs, i.e., attracting teachers with specific qualifications or retaining those with valuable experience. *See Richland County Sch. Dist. Two,* 335 S.C. at 493, 517 S.E.2d at 446 ("Teacher's [sic] salaries now contain a combination of EFA funds, EIA funds, and *optional* local salary supplements.") (emphasis added). In any event, it is important to note that "for every dollar a school district increases their local salary supplement, the EIA funds provided by the [s]tate decrease by an equal dollar amount." *Id.* at 497–98, 517 S.E.2d at 448. In other words, "[a] teacher's [minimum] salary is now computed by adding (a) the EFA base salary amount, (b) the local salary supplements, and (c) then using the EIA funds as a plug to ensure the total teacher's salary equates with the southeastern average." *Id.* As a result, some wealthier school districts receive no EIA funds because they pay supplements which raise teacher salaries well above the southeastern average/state minimum. It is these supplemental funds which are at issue in this case.

Employers argue, and the trial court found, that the statutory language "average school supplement" does not entitle Employees to an additional amount above and beyond the state salary minimum for teachers. Instead, the court held the phrase "average school supplement" actually refers to "the mandatory local portion of the EFA base salary" (which is, of course, *included* in the state minimum), rather than the discretionary supplements from individual school districts described above. According to the court and Employers, "[b]y specifying both 'state and average supplement pay scales,' the General Assembly was trying to explicitly require the DOC

and District to pay their teachers both portions of the EFA teacher pay schedule." This construction is simply untenable.

It is presumed the legislature included the words "state" *and* "average school supplement" for a reason; if "average school supplement" merely refers to the "local portion" of the EFA-mandated state minimum salary requirement, its use in § 24–25–70(7) would be superfluous. It is well settled, however, that statutes "should be so construed that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous." *Pike v. South Carolina Dep't of Transp.*, 332 S.C. 605, 618, 506 S.E.2d 516, 523 (Ct.App.1998) (quoting *Matter of Decker*, 322 S.C. 215, 219, 471 S.E.2d 462, 463 (1995)). Moreover, given that construction, the phrase as used in § 24–25–70(7) seemingly would require Employers to contribute "locally-generated" funds to Employees' salaries, a patent absurdity. The District, as part of the Department of Corrections, clearly has no tax base from which to generate revenue, and this Court will not render an interpretation which leads to such an illogical conclusion. *See Ray Bell Constr. Co., Inc. v. School Dist. of Greenville County*, 331 S.C. 19, 26, 501 S.E.2d 725, 729 (1998) (stating that courts ordinarily will reject a proposed statutory meaning "when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention") (quoting *Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994)). Finally, use of the plural "scales" evidences an intention that teacher pay in the District should be based on two separate pay schedules, a "state" pay scale and an "average school supplement" pay scale. *See Emerson Elec. Co. v. Wasson*, 287 S.C. 394, 397, 339 S.E.2d 118, 120 (1986) ("The legislature's use of the plural 'taxpayers' instead of 'taxpayer' indicates that corporations filing consolidated returns are not to be considered a single entity.").

 In construing a statute, our primary goal is to ascertain and effectuate the intent of the Legislature. *Jackson v. Charleston County Sch. Dist.*, 316 S.C. 177, 447 S.E.2d 859 (1994); *Gilstrap v. S.C. Budget and Control Board*, 310 S.C. 210, 423 S.E.2d 101 (1992). Each provision, therefore, "should[ be given a reasonable construction[ ] consistent with the purpose and policy of the Act." *Jackson*, 316 S.C. at 181,

447 S.E.2d at 861; *Gardner v. Biggart,* 308 S.C. 331, 417 S.E.2d 858 (1992). Legislative intent "should be ascertained primarily from the plain language of the statute." *Richland County Sch. Dist. Two,* 335 S.C. at 496, 517 S.E.2d at 447 (quoting *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 339, 478 S.E.2d 74, 77 (Ct.App.1996)).

▆▆▆▆ Furthermore, a primary rule of statutory interpretation is that "words must be given their plain and ordinary meaning without resort to a subtle or forced construction which limits or expands the statute's operation." *Adkins v. Varn,* 312 S.C. 188, 191, 439 S.E.2d 822, 824 (1993); *see Richland County Sch. Dist. Two,* 335 S.C. at 496, 517 S.E.2d at 447. Thus, when a statute contains "clear and unambiguous" terms, this Court "must apply those terms according to their literal meaning." *Adkins,* 312 S.C. at 191, 439 S.E.2d at 824; *see also Citizens for Lee County, Inc. v. Lee County,* 308 S.C. 23, 28, 416 S.E.2d 641, 644 (1992) ("In construing statutes, the terms used therein must be taken in their ordinary and popular meaning.").

We agree with Employees that the plain language of "teachers' pay schedule based on the state and average school supplement pay scales" means that, in addition to the state mandatory minimum, Employees are entitled to additional compensation equal to the mathematical average of all salary supplements paid by school districts across the state. Such a construction comports with statutory provisions guaranteeing teachers who are state employees but not employed by a particular school district a salary adjusted to reflect the salary schedules of the surrounding school districts. *See* S.C.Code Ann. § 59–25–50 (1990) ("Each state agency shall receive such funds as are required to adjust the pay of all certified instructional personnel to the appropriate salary provided by the salary schedules of the surrounding school districts ...."); S.C.Code Ann. § 8–11–271 (1986) ("The salary structure for [certified] employees at the South Carolina School for the Deaf and Blind ... shall be on the basis of comparable daily compensation with the school district with which the School for the Deaf and Blind competes for instructional personnel."). Presumably, the Legislature intended the combination of the state minimum and average school supplement pay scales as a

similar guarantee so that Employees, like their colleagues at other state agencies, would be paid in a manner comparable to public school teachers in the "surrounding" (and in the case of District "statewide") school districts.[5]

Because we find § 24–25–70(7) authorizes additional compensation to Employees based on an average of these local school supplements, which Employers admit has not been paid, we reverse the grant of summary judgment and remand this issue to the trial court for a determination of appropriate back pay consistent with this opinion. *See Johnson v. Spartanburg County Sch. Dist. No. 7*, 314 S.C. 340, 444 S.E.2d 501 (1994) (affirming reinstatement of assistant principal and remanding to the trial court for a calculation of back pay and appropriate allowances).

## IV. Payment of Wages Act

Employees further contend that Employers' "[w]ithholding [of] compensation for scheduled work days and deduction of 15 leave days per year violates the South Carolina Payment of Wages Act." We disagree.

■■■ "[T]he South Carolina Payment of Wages Act is remedial legislation designed to protect working people and assist them in collecting compensation *wrongfully withheld*." *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 194, 463 S.E.2d 641, 645 (Ct.App.1995) (emphasis added). Because we have already determined Employers' 235–day pay schedule for Em-

---

5. Employers also proffer several "considerations" which they claim support the decision to not pay Employees a salary supplement: a number of school districts do not pay the optional local supplement; the District does not have an independent tax base from which to draw financial support; the Legislature did not specifically appropriate funds to the District to pay for salary supplements; the Department of Education has never cited the District during the course of numerous audits for failing to pay such supplements. None of these rationales, however, absolves Employers of their duty to pay Employees as section 24–25–70(7) directs. *See, e.g., Hatchett v. Nationwide Mut. Ins. Co.*, 244 S.C. 425, 431–32, 137 S.E.2d 608, 611 (1964) ("The responsibility for the justice or wisdom of legislation rests with the Legislature, and it is the province of the courts to construe, not to make, the laws.") (quoting *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 395, 134 S.E.2d 206, 209 (1964)).

ployees is appropriate, the trial court properly granted summary judgment on this issue.

## V. "Total Compensation Package"

Finally, Employees argue the trial court erred in concluding, as an alternative basis for summary judgment, that their "total compensation package" exceeded any amounts to which they allegedly were entitled, thereby "further illuminat[ing] the equities of [the] case" and convincing the court that Employees' compensation "has been dealt with legally, equitably and in good faith" by Employers.

In its amended order, the trial court found that "the value of the benefits currently being provided to [Employees] more than compensates them for the difference [in pay] they claim entitlement to." The court went on to note that such benefits as annual leave, paid holidays, sick leave, salaries tied to certain "cell levels" or levels of experience and the mandatory Southeastern schoolteacher average, and participation in the Police Officers' Retirement System indicate Employees have "ended up with the best of both worlds in terms of benefits." Therefore, the court reasoned, Employees "cannot complain that they have been unfairly compensated" by Employers.

We agree with Employees that these benefits do not relieve Employers of their obligation to pay Employees according to law and clearly are irrelevant to any determination of Employees' entitlement to compensation particulars provided for by statute. Moreover, nothing in the overall legislative scheme governing teacher pay in the District permits such a set-off against Employees' salaries. Accordingly, summary judgment on this issue is reversed.

For the foregoing reasons, the grant of summary judgment to Employers is

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

CURETON and GOOLSBY, JJ., concur.