724 S.E.2d 675

James "Cal" BELL, Othella Bernard, Katherina Bower, Linda M.W. Bratton, Ann T. Bridges, Richard M. Cobb, as Personal Representative of the Estate of Rance C. Cobb, Jeannie B. Croxton, Bernetha L. Culbreath, William K. Dreyer, Jacqueline D. Farr, Ruth Fritts, Nancy Glenn, Etta Jane Jones, Geneva M. Martin, Mary H. McCabe, Beverly McClanahan, Max D. Randolph, Carolyn McIver Smith, Maggie G. Williams, and Paula Woodlief, Appellants,

v.

SOUTH CAROLINA DEPARTMENT OF CORRECTIONS and Palmetto Unified School District No. 1, Respondents.

No. 27114.

Supreme Court of South Carolina.

Heard Jan. 25, 2012.

Decided April 11, 2012.

W. Allen Nickles, III, of Columbia, for Appellants.

Lake E. Summers and Katherine Phillips, of Malone, Thompson, Summers & Ott, of Columbia, for Respondents.

Justice BEATTY.

Appellants, who are current and former certified educators employed by the South Carolina Department of Corrections ("SCDC") in the Palmetto Unified School District ("PUSD"), collectively appeal the Administrative Law Court's ("ALC's") order affirming the State Employee Grievance Committee's decision denying Appellants' grievances regarding the SCDC's Reduction–in–Force ("RIF"),[1] which was implemented on June 1, 2003.

On appeal, Appellants contend the ALC erred in failing to enforce: (1) the plain language of the RIF policy; (2) the controlling legislation applicable to the PUSD and the RIF policy; (3) Appellants' constitutional rights with respect to employment; and (4) Appellants' rights as "covered employees" with respect to the RIF policy. Based on these alleged errors, Appellants assert they are entitled to reinstatement to employment as well as back pay and benefits. We affirm in part, reverse in part, and remand.

## I.

In 1981, the South Carolina Legislature established a "special statewide unified school district" within the SCDC known as the Palmetto Unified School District No. 1.[2] The PUSD was designed to "enhance the quality and scope" of inmate education with a goal of reintegrating offenders into the communi-

---

1. " 'Reduction in force' means a determination made by an agency head to eliminate one or more filled positions in one or more organizational units within the agency due to budgetary limitations, shortage of work, or organizational changes." S.C.Code Ann. § 8–17–320(21) (Supp.2011).

2. S.C.Code Ann. § 24–25–10 (2007).

ty.[3] The PUSD operates nine high schools, which are located in correctional institutions throughout the state, serving students between the ages of 17 and 21 years old. In addition, the PUSD offers inmates older than 21 the opportunity to receive adult education if they wish to pursue their GED while incarcerated. The PUSD also oversees a vocational program that offers 53 vocational and career technology classes designed to furnish inmates with basic technical skills to aid them in securing gainful employment upon their release.

As a sanctioned school district, the PUSD must meet standards set by the State Board of Education.[4] The PUSD has its own superintendent and school board[5] that are responsible for operating the PUSD "under the supervision of the State Department of Corrections."[6] By statute, "[t]he superintendent of the district [PUSD] and all other educational personnel shall be employed, supervised, and terminated according to the South Carolina Department of Corrections' personnel policies and procedures."[7]

In January 2003, Jon Ozmint was appointed as the Executive Director of the SCDC. Faced with budget cuts and an ongoing budget deficit, Ozmint presented Reduction–in–Force policy ADM–11.05 dated March 14, 2003, to the State Office of Human Resources (OHR) for its approval.[8] The policy outlined the procedures to be utilized in effectuating the RIF plan and the employees' respective rights.

As part of the plan, the SCDC was divided into "competitive areas,"[9] which were delineated by eleven circular regions

---

3. *Id.* § 24–25–20.

4. *Id.* § 24–25–30.

5. *Id.* § 24–25–70.

6. *Id.* § 24–25–40.

7. *Id.* § 24–25–90.

8. *See* 23A S.C.Code Ann. Regs. 19–719.04 (Supp.2010) (outlining state agency RIF policies and procedures). We note that this section was amended by State Register Volume 34, Issue Number 5, which became effective on May 28, 2010. In the interest of clarity, we have cited to the version in effect prior to the amendment unless otherwise noted.

9. According to the RIF policy, a "competitive area may be agency wide, a department, or a more restricted geographical area where the staff

throughout the state that included "entire groups of institutions and divisions within a reasonable geographic area to accommodate the realistic opportunity for staff relocation, . . . recall and reinstatement." Under the RIF policy, a "covered state employee" [10] whose position was eliminated as a result of the RIF was permitted to "bump" [11] another "employee with the lowest RIF Service Date in the same job classification and pay band with the same or lower pay level." A "covered employee," however, could only exercise this right within his or her designated competitive area.[12]

Additionally, the RIF policy provided for "Recall and Reinstatement Rights of Employees." [13] Specifically, the policy provided in pertinent part:

When a vacancy occurs in an employee's competitive area which is (1) in the **same job class**, pay band, pay level **or lower**, and **functionally similar** as the position held prior to the lay off, downward bumping, or reassignment and (2) within a reasonable geographic distance (30 mile radius) of the work location of the employee, then the eligible employ-

---

isseparately organized and clearly distinguishable from the staff in other areas."

10. A "covered employee" is defined as "a full-time or part-time employee occupying a part or all of an established full-time equivalent (FTE) position who has completed the probationary period and has a 'meets' or higher overall rating on the employee's performance evaluation and who has grievance rights." S.C.Code Ann. § 8–17–320(7) (Supp.2011). This definition does not include "employees in positions such as temporary, temporary grant, or time-limited employees who do not have grievance rights." *Id.*

11. " 'Bumping' refers to the action taken when an employee subject to lay off is placed in a vacant position or displaces ('bumps') another employee in the same or another job classification and/or location."

12. *See* 23A S.C.Code Ann. Regs. 19–719.04(B)(2)(b) (Supp.2010) ("Competitive area(s) shall be determined by the agency according to critical needs. Any covered employee affected by a reduction in force shall have bumping rights within a competitive area(s).").

13. *See* 23A S.C.Code Ann. Regs. 19–719.04(B)(4)(a) (Supp.2010) ("Any covered employee affected by a reduction in force shall retain covered status and recall rights for a period of one year from the date of separation.").

ee will be offered the vacancy provided s/he meets the minimum training and experience qualifications.

In his letter addressed to the Director of the OHR, Ozmint stated that he had made the decision to eliminate "148 non-security" positions from headquarters management and administrative support staff, non-essential inmate support programs, and certified education and support staff.

On March 28, 2003, the OHR approved the RIF plan after determining the plan was "procedurally correct." The OHR, however, clarified that its approval did not "include the determination of the geographic locations in the competitive areas, competitive classes, competitive class series, bumping rights, the positions to be eliminated, or any exceptions included in the plan, since these are solely the responsibility of SCDC management."

The SCDC notified its employees of the RIF on April 1, 2003. On June 1, 2003, the day the RIF plan went into effect, 148 employment positions were eliminated from the SCDC. The PUSD lost 84 positions, which included Appellants and represented 56.75% of the RIF.

On July 16, 2003, Ozmint notified SCDC employees of a "Retirement Opportunity" that had been established to further reduce costs. Under this plan, the SCDC would permit employees to retire from the agency between August 1 and October 1, 2003. Once retired, the employee was required to "experience a 15 calendar-day break in service" and then could be rehired in their present position but in a temporary capacity. A temporary employee [14] did not receive benefits other than "retiree benefits" and was paid for hours actually worked.

Appellants, who were certified educators with the PUSD and "covered employees," timely filed grievances with the SCDC regarding their separation from employment as a consequence of the RIF.[15] The SCDC denied each of the grievances without a hearing.

---

14. A "temporary employee" is defined as "a full-time or part-time employee who does not occupy an FTE (Full–Time Equivalent) position, whose employment is not to exceed one year, and who is not a covered employee." S.C.Code Ann. § 8–17–320(25) (Supp.2011).

15. *See* S.C.Code Ann. § 8–17–330 (Supp.2011) ("A reduction in force is an adverse employment action considered as a grievance only if the

Subsequently, each of the Appellants appealed the SCDC's denial of their grievances to the State Human Resources Director. After Appellants received the final, unfavorable decision of the State Human Resources Director, Appellants filed a consolidated complaint and petition for judicial review in the circuit court.

After several procedural hearings and rulings involving discovery, a circuit court judge found that material issues of fact existed regarding Appellants' contention that the SCDC inconsistently or improperly applied its RIF policy and plan in 2003. As a result, the judge remanded the matter to the OHR for disposition by hearing before the State Employee Grievance Committee ("Committee").

Following ten days of hearings, the Committee issued its final decision denying Appellants' request for relief and upholding the June 1, 2003 RIF plan as implemented by the SCDC. The Committee found there was "insufficient evidence to support Appellants' allegations that the RIF policy or plan was improperly or inconsistently implemented." Additionally, the Committee concluded there was "no credible evidence presented that the elimination of educator positions in the PUSD was motivated by a desire for retaliation for an earlier lawsuit [16] that resulted in the increase of educators' salaries." Instead, the Committee found the RIF plan was developed to "maximize[ ] savings while retaining as many employees as possible in essential areas." The Committee noted that "[t]he education program was one area where significant cost-saving opportunities existed" as opposed to such areas as "security, housing, clothing, food, and healthcare" where further budgetary cuts could not be "tolerated."

In reaching its conclusion, the Committee found the SCDC "followed proper protocol and did not violate any policies,

agency, or as an appeal if the State Human Resources Director, determines that there is a material issue of fact that the agency inconsistently or improperly applied its reduction in force policy or plan.").

16. *See Abraham v. Palmetto Unified Sch. Dist. No. 1*, 343 S.C. 36, 538 S.E.2d 656 (Ct.App.2000) (holding that Appellants, who were employed as PUSD teachers, were entitled to a salary supplement based on the statewide school district average in addition to the state mandatory minimum salary).

procedures, or statutes." Specifically, the Committee found that: (1) educators were not unfairly targeted for termination or terminated based on a belief by other employees or members of management that educators were "overpaid" but, rather, as the result of "cost-saving principles" due to the high salaries of most educators as compared to other personnel; (2) the development of the competitive areas did not violate the RIF policy as the manner in which these areas are designated is left to the discretion of the Executive Director of the SCDC and neither state law nor the RIF policy required the PUSD to be treated as a single, competitive area to afford agency-wide bumping rights; (3) the SCDC management was not obligated by statute or policy to consult with the PUSD School Board or obtain its approval before implementing the RIF as the PUSD is not a separate entity but exists as a unit under the purview of the SCDC; (4) the retirement opportunity offered by the SCDC after the RIF was designed to further reduce operating costs by permitting employees to retire from their full-time positions and return to their positions in a temporary capacity, a position for which recall rights were inapplicable; and (5) the hiring of temporary employees before the RIF and the retention of certain temporary employees after the RIF did not violate the approved RIF policy as these positions were less costly than full-time positions given that the positions were hourly and without benefits.

Appellants appealed the Committee's final decision to the ALC. Following a hearing, the ALC affirmed the Committee's decision. In a detailed order, the ALC denied each of Appellants' claims by reiterating and elaborating on the Committee's conclusions of law. Additionally, the ALC rejected Appellants' supplemental argument regarding an alleged equal protection violation. Specifically, the ALC found the SCDC had a rational basis "by which to both implement its RIF through the establishment of 11 competitive areas and to offer its retirement opportunity to those employees unaffected by the RIF who were retirement eligible."

Appellants appealed the ALC's final decision to the Court of Appeals. This Court certified the appeal from the Court of Appeals pursuant to Rule 204(b) of the South Carolina Appellate Court Rules.

## II.

### A.

The Administrative Procedures Act establishes this Court's standard of review for cases decided by the ALC and is set forth in section 1–23–610(B) of the South Carolina Code, which provides:

> The review of the administrative law judge's order must be confined to the record. The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–610(B) (Supp.2011).

### B.

In challenging the legitimacy of the RIF policy and plan, Appellants raise multiple arguments through the presentation of factual issues, RIF policy provisions, statutory law, and constitutional law. Rather than address these points separately, we find the most logical approach to analyzing these arguments is to categorize the issues into Appellants' claims regarding the creation, implementation, and effectuation of the RIF.

### C.

Because the PUSD is statutorily defined as a "unified," statewide school district, Appellants contend the PUSD should not have been included in the RIF as it is a separate entity of

the SCDC. In the alternative, Appellants claim the PUSD's Superintendent and Board should have been consulted and actively involved in the creation of the RIF policy and plan. In support of this claim, Appellants direct this Court's attention to Superintendent Wendell Blanton's testimony wherein he stated that he only heard about the RIF plan shortly before it was implemented.

In addition to these procedural challenges, Appellants assert the SCDC, via Ozmint and John Near,[17] exceeded its authority in dividing the agency into eleven competitive areas as these geographic regions were arbitrarily drawn solely for the purpose of eliminating "bumping" rights for senior PUSD employees. Appellants claim these geographic regions had "no bearing on administration or delivery of educational services" and ultimately deprived Appellants of the opportunity to compete for vacant positions throughout the state rather than only in their limited geographic region, which encompassed a thirty-mile radius.

As will be discussed, we conclude the ALC properly affirmed the Committee's decision regarding the SCDC's creation of the RIF policy and resultant plan.

**1.**

Although section 24–25–40 of the South Carolina Code authorizes the Superintendent and the Board to operate the PUSD, they do not operate independently as this code section also states that this division is "under the supervision of the State Department of Corrections." Furthermore, as previously identified, section 24–25–90 of the South Carolina Code specifically includes the PUSD and all other educational personnel within the SCDC and subjects them to the agency's personnel policies and procedures regarding employment and termination.

In addition to this legislative mandate, there is evidence in the record that the PUSD operates and is viewed as a functional subsidiary of the SCDC. John Near testified regarding the organizational structure of the SCDC. Near stated

---

17. John Near, who served as the Director of the Department's Division of Human Resources in 2003, drafted the RIF policy and prepared the RIF plan, including the identification of the competitive areas.

the SCDC has twenty divisions, which include the Education Division. Geraldine Miro, the Deputy Director for the SCDC's Programs and Services, classified the PUSD as a component of the Division of Education within the SCDC. Additionally, Wendell Blanton the PUSD's Superintendent testified that the PUSD "encompasses education in the Department of Corrections." He added that he not only reported to the PUSD Board but also to Miro. He also admitted that the PUSD, unlike a regular school board, had "limited power." Finally, several witnesses testified that the PUSD does not have its own finance office, payroll department, or human resource office as these are centrally located and operated in the SCDC's headquarters in Columbia.

Because the PUSD exists as merely a division under the purview of the SCDC's Executive Director and not as a separate entity, it was properly included in the RIF. By the same reasoning, there is no statutory authority to support Appellants' position that its Superintendent or Board should have been consulted and involved in the creation of the RIF policy and plan.

### 2.

As the record reflects, all divisions of the SCDC were included in and affected to some extent by the RIF. Like the other divisions, the PUSD was subject to the authority of Ozmint. In this capacity, Ozmint was authorized with broad discretion to create an RIF policy and plan to reduce costs within the SCDC. As recognized by the OHR's approval of the RIF policy, Ozmint legitimately identified the education division as being less essential compared to those divisions involving security, housing, clothing, food, and healthcare. Although a disproportionate number of PUSD positions were eliminated as compared to other divisions, we agree with the ALC that Ozmint did not exceed his authority by creating the eleven competitive areas to effectuate the RIF plan.

According to the applicable regulations, the SCDC is specifically authorized to determine the "competitive areas" according to the "critical needs" of the agency. 23A S.C.Code Ann. Regs. 19–719.04(B)(2)(b) (Supp.2010). Furthermore, contrary to Appellants' assertions, the geographic limitation of a thirty-mile radius is specifically provided for in paragraph 7.2 of the

RIF Policy and appears to be validly derived from section 8–17–320 definitional provisions and the OHR's regulatory provision 19–700, which defines an "involuntary reassignment" as "the movement of an employee's principal place of employment in excess of thirty miles from the prior work station at the initiative of the agency." *See* S.C.Code Ann. § 8–17–320(13) (Supp.2011) (defining "involuntary reassignment" of an agency employee); 23A S.C.Code Ann. Regs. 19–700 (Supp. 2010) (same).

Moreover, each competitive area included at least one correctional institution and, in turn, at least one school. Because each correctional institution has its own organizational structure, we reject Appellants' contention that the designation of the eleven areas violated the terms of the RIF policy as the staff within each correctional institution and school are "separately organized and clearly distinguishable from the staff in other areas."

There is also evidence in the record that the eleven geographic areas were reasonable based on financial and employee "bumping" considerations. Near, who was directed by Ozmint to create the competitive areas, testified he and his staff developed these areas based on the threshold understanding that an involuntary reassignment of an agency employee is limited to a thirty-mile radius. Near claimed the creation of the geographic areas was the best option to provide eliminated SCDC employees with the "biggest opportunity to bump" in a confined area so that they would not have to relocate to another area of the state. Ozmint also testified the regions were drawn to minimize bumping which, in turn, would result in cost savings. Jon Davis, the Director of Audits for the SCDC, testified the areas were allocated in such a way that "when the RIF took place, it would be a reasonable area for people to bump into and they wouldn't have such a huge commute to have to go all the way across the state." Davis compared the small geographic area to that of a "normal school district."

Based on the foregoing, we agree with the ALC that there were no procedural or statutory violations committed by the SCDC in creating the RIF. The RIF policy and plan complied with the requisite administrative and legislative provisions and

was approved by the OHR as "procedurally correct" prior to its implementation.

In view of our decision, the question becomes whether the SCDC properly implemented the RIF plan.

### D.

Appellants contend the SCDC's method of reassigning employees to temporary positions and rehiring retirees in a temporary capacity to provide educational services violated the provisions of the RIF policy. Based on the SCDC's utilization of temporary employees before and after the RIF, Appellants assert their rights as "covered employees" were violated given they were precluded from being "recalled" into positions that were filled by temporary employees or briefly vacated when employees retired. Additionally, those Appellants who retained employment with the SCDC after the RIF assert they received a correctional officer's pay, which was "significantly below the statutory teacher pay schedule" despite performing essentially the same educational duties as they did prior to the RIF.

### 1.

We find Appellants are correct in their assessment of the SCDC's utilization of temporary employees.

There is no dispute that Appellants were "covered employees" at the time the SCDC implemented the RIF on June 1, 2003. As "covered employees," Appellants were entitled to be recalled for a period of one year (June 1, 2003 through May 31, 2004) if a position for which they were eligible became vacant. 23A S.C.Code Ann. Regs. 19–719.04(B)(4)(a) (Supp. 2010).

As the record reflects, several employees retired pursuant to the SCDC's "Retirement Opportunity" on July 16, 2003 and were then rehired by the SCDC in a temporary capacity. Although the SCDC was statutorily authorized to rehire these retirees, this optional decision should not have nullified Appellants' recall rights.

Once retired, the SCDC employees were required to "experience a 15 calendar-day break in service" and could be

rehired in their present positions but in a temporary capacity. Because these employees experienced a "break in service" [18] when they retired, their positions became vacant. Furthermore, at the point of their retirement, these employees lost any "right" to re-employment as this decision is within the discretion of the SCDC. *See* S.C.Code Ann. § 9–11–90(4)(a) (Supp.2011) (outlining retirement provisions for PORS and stating, in part, that "[a] retired member of the system who has been retired for at least fifteen consecutive calendar days may be hired and return to employment covered by this system or any system provided in this title without affecting the monthly retirement allowance he is receiving from this system"); *Ahrens v. State*, 392 S.C. 340, 709 S.E.2d 54 (2011) (noting textual similarities between SCRS (section 9–1–1790) and PORS statutes and recognizing that an employee's decision to return to work after retiring was optional, as was an employer's decision to re-hire that employee).

In contrast, Appellants had statutory and policy priority over the retirees to be recalled into the vacant position. *See* S.C.Code Ann. § 8–11–185(C) (Supp.2011) ("An agency seeking to fill a vacancy or a new position must obtain information from the Office of Human Resources' reduction in force applicant pool provided to the office pursuant to subsection (A). An agency shall provide priority consideration to employees terminated due to a reduction in force for any vacancy or new position in the same classification, classification series, or position category held at the time of layoff. An agency is prohibited from filling the position if the agency does not first seek to fill the position from among these qualified employees provided by the Office of Human Resources.").

Thus, Appellants were entitled to be recalled for the vacant positions. By implementing the "Retirement Opportunity" and immediately "recasting" the vacant positions as temporary positions, the SCDC deprived Appellants of their recall rights. Furthermore, there is evidence in the record that some of the

---

18. Regulation 19–700 defines a "break in service" as "an interruption of continuous State service" and identifies six scenarios that satisfy this definition. 23A S.C.Code Ann. Regs. 19–700 (Supp.2010). Subsection six of this regulation delineates a move "from a full-time (FTE) position to a temporary, temporary grant, or time-limited position" as constituting a "break in service." *Id.*

rehired retirees were retained for more than one year in clear violation of the statutory definition of a "temporary employee," which in essence converted the temporary position to a Full–Time Equivalent (FTE) position.

Based on the foregoing, we conclude the ALC erred as a matter of law in analyzing the temporary employee issue. Accordingly, we reverse this portion of the ALC's order.

### 2.

■ The record reflects that four Appellants were retained as employees after the RIF, but were classified and paid as correctional officers rather than certified educators despite performing nearly identical duties as those assigned before the RIF.

James Bell testified that, prior to the RIF, he was employed as a vocational carpentry teacher at Perry Correctional Institution. He received his certification for vocational carpentry in 1977 and was first employed with the PUSD beginning in 1992. Bell lost this position due to the RIF, but was rehired in January 2006 to teach carpentry at the same location. Although he performed the same duties as before the RIF, Bell testified that he received approximately $13,000 less than he was making in June 2003.

Nancy Glenn testified she was employed as a librarian for approximately eleven years prior to the RIF. After the RIF, Glenn lost her position but accepted a job as a correctional officer. According to Glenn, she performed the same librarian duties in the new position with "some additional duties as officer." She further stated that she worked in the same building before and after the RIF. Glenn, however, received approximately "one-half" her previous salary. Glenn served in this position for almost two years before being hired as classroom teacher and librarian at Trenton Correctional Institution.

Mary McCabe testified that she was employed as a library/media specialist in the education department located at Perry Correctional Institution prior to the RIF. After the RIF, McCabe accepted a position as a correctional officer in order to avoid losing her insurance and other state employee benefits. McCabe did not go through officer training and still

performed her duties as the library/media specialist. McCabe testified that she received a $2,100 reduction in pay. One month later, McCabe was offered the option of being called back into the position of library/media specialist on the condition that she would be transferred to the Tyger River Correctional Institution. McCabe accepted the offer with the understanding that she would be paid according to the teachers' pay schedule. Although McCabe was responsible for two libraries, she testified that her pay did not increase but remained at the "same teacher scale pay" in the amount equal to her salary before the RIF.

Beverly McClanahan testified that prior to the RIF she was employed to teach vocational horticulture at Broad River Correctional Institution. After the RIF, McClanahan accepted a position as a correctional officer with a $23,000 reduction in pay. In August 2004, McClanahan was asked to "come back and teach vocational horticulture but as a lieutenant." In this position, which was entitled "vocational trainer," McClanahan performed duties that "were exactly the same" as those that she had done prior to the RIF. In June 2005, McClanahan accepted a position at the Department of Juvenile Justice to teach horticulture and science. In this position, McClanahan was compensated according to the teachers' pay schedule.

In view of this evidence, we find the SCDC effectively circumvented the Court of Appeals' decision in *Abraham* as the affected Appellants were certified educators performing educational duties; thus, they were entitled to a salary that was commensurate with the teachers' pay schedule as established in *Abraham*. *See Abraham v. Palmetto Unified Sch. Dist. No. 1,* 343 S.C. 36, 49, 538 S.E.2d 656, 663 (Ct.App.2000) (interpreting section 24–25–70(7) of the South Carolina Code and concluding that "the plain language of 'teachers' pay schedule based on the state and average school supplement pay scales' means that, in addition to the state mandatory minimum, [the PUSD] Employees are entitled to additional compensation equal to the mathematical average of all salary supplements paid by school districts across the state").

Our decision is guided by our recent opinion in *Grimsley v. South Carolina Law Enforcement Division,* 396 S.C. 276, 721

S.E.2d 423 (2012). In *Grimsley*, Appellants were rehired employees of the South Carolina Law Enforcement Division ("SLED") and members of the Police Officers Retirement System. As part of this process, SLED required Appellants to sign a form, which provided that Appellants "will have a reduction of 13.6% in [their] salary to cover the amount it will cost SLED to pay the employer portion of retirement." *Id.* at 279, 721 S.E.2d at 425. Appellants brought a takings claim on the ground this provision was contrary to section 9–11–90(4)(b) of the South Carolina Code, which assigns the responsibility for the employer portion of retirement to the employer. *Id.* We agreed with Appellants, finding their "takings claim [was] predicated on their entitlement to retain the percentage of their salary—13.6%—that was used to pay the employer portion of the retirement contributions." *Id.* at 285, 721 S.E.2d at 428. Accordingly, we concluded that section 9–11–90 provided a basis for Appellants to assert a cognizable property interest rooted in state law that was sufficient to survive Respondent's motion to dismiss. *Id.*

Similar to the employees' statutory right in *Grimsley*, Appellants as "covered employees" were statutorily entitled to be recalled to vacant positions for a period of one year following the RIF. Furthermore, those employees who were retained after the RIF and performed the same educational duties were entitled to a salary based on the teachers' pay schedule established in *Abraham*. The SCDC could not, through an internal policy, deprive Appellants of these interests rooted in state law.[19]

19. As previously noted, the Regulations regarding RIFs were amended and became effective of May 28, 2010. Of import is a provision that states,

When a covered employee is assigned lower level responsibilities or demoted as a result of a reduction in force implemented due to budgetary reductions, the employee's salary may be reduced on the effective date of the reduction in force. The agency head or his designee, at his discretion, may reduce the employee's salary to a salary either between 0%–15% below the employee's current salary or between the employee's current salary and the midpoint of the lower pay band. In exercising this discretion, the agency head or his designee may use the option which results in the greatest cost savings.

1 S.C.Code Ann. Regs. 19–719.04(A)(5) (2011). We find this provision is inapplicable in the instant case as: (1) it post-dates the June 2003

### E.

Finally, Appellants contend the RIF deprived them of the constitutionally protected right to continuing employment in violation of due process of law and the equal protection of laws. Specifically, Appellants explain that "[a]s 'covered employees,' [they] enjoyed the right to retain employment unless removed for cause or by proper reduction in force."

As previously discussed, we find Appellants were arbitrarily and capriciously denied a right to employment pursuant to their recall rights and a property interest as to their compensation established in *Abraham.* Thus, our decision to reverse the ALC with respect to the temporary employee issue and the salary issue is determinative that Appellants' substantive due process rights were violated.

We decline to address Appellants' remaining constitutional arguments as a decision would be inconsequential given our prior rulings. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when disposition of a prior issue is dispositive); *see also Arnal v. Fraser,* 371 S.C. 512, 523, 641 S.E.2d 419, 424 (2007) ("It is our firm policy to decline to rule on constitutional issues unless such a ruling is required.").

### III.

Based on the foregoing, we find the SCDC properly created the RIF policy and submitted it to the OHR for approval. Because the OHR deemed the RIF "procedurally correct," the ALC correctly affirmed the Committee's decision regarding the inclusion of the PUSD in the RIF and the designation of the eleven competitive areas. We, however, conclude that the SCDC violated statutory law in precluding Appellants from exercising their priority right to recall as to the positions vacated by the retirees. Because the "Retirement Opportunity" offered by the SCDC required a fifteen-day break in service before rehiring, we find that "window" constituted a

RIF; and (2) the affected Appellants were not assigned lower level responsibilities but, rather, performed nearly identical duties to those assigned prior to the RIF.

vacancy for which Appellants should have been offered the opportunity for employment. In a related issue, we find the SCDC violated the *Abraham* decision by retaining certified educators after the RIF but paying them as correctional officers as they were entitled to be compensated commensurate with the teachers' pay schedule. Accordingly, we affirm in part, reverse in part, and remand this case to the Committee to determine the appropriate relief.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

TOAL, C.J., PLEICONES, KITTREDGE and HEARN, JJ., concur.